# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

JEFFREY STEVEN McCREARY,

                                    Petitioner,

v.

RALPH DIAZ, Secretary,

                                    Respondent.

Case No.:  18cv0789-CAB (BGS)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY**

Jeffrey Steven McCreary (hereinafter "Petitioner"), is a state prisoner proceeding *pro se* and *in forma pauperis* with a Second Amended Petition for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254. (Electronic Case Filing ["ECF"] No. 19.) He challenges his San Diego Superior Court conviction for first degree murder with the personal use of a firearm, for which he was sentenced to 100 years-to-life in state prison, enhanced by two prior felony convictions. (*Id.* at 1-2.) He claims his federal constitutional rights were violated by the denial of his motion to substitute counsel to file a motion for a new trial (claim one), introduction of evidence he had been in prison (claim two), omission of an element of the firearm use enhancement from the verdict form (claim three), use of his prior convictions to enhance his sentence (claim four), failure to give an instruction on aiding and abetting in response to a jury question (claim five), insufficient evidence of kidnapping (claim six), failure of the prosecutor to timely disclose a witness (claim seven),

ineffective assistance of trial counsel (claims eight, eleven and twelve), prosecutorial misconduct and ineffective assistance of trial counsel for failing to object (claims nine and ten), failure of the state habeas court to hold an evidentiary hearing (claim thirteen), and because he is actually innocent (claim fourteen). (*Id.* at 6-20.) Petitioner requests an evidentiary hearing. (*Id*. at 19.)

Respondent has filed an Answer and lodged the state court record. (ECF Nos. 24-25, 36.) Respondent argues habeas relief is unavailable because claims three, eight through twelve, and fourteen are procedurally defaulted, claims two, four, five, thirteen and fourteen do not present cognizable claims, and the state court adjudication of all federal claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts. (ECF No. 24 at 2-11.) Petitioner has filed a Traverse. (ECF No. 29.)

For the foregoing reasons, Petitioner's request for an evidentiary hearing is denied, the Petition is denied, and the Court declines to issue a Certificate of Appealability.

## I.    PROCEDURAL BACKGROUND

On March 27, 2012, Petitioner and his codefendant Destin Lee Withers were charged with murdering Denise Rodriguez. (ECF No. 25-32 at 11-12.) It was alleged both men were armed with and personally and intentionally discharged a semi-automatic handgun resulting in the victim's death. (*Id*.) It was further alleged Petitioner had two prior felony convictions which constituted strikes under California's Three Strikes law, and Withers had three prior felony convictions which constituted prison priors. (*Id*. at 12-13.)

Petitioner and Withers were jointly tried before a single jury. They both testified and named each other as the killer, and on June 13, 2014, were both found guilty of first-degree murder. (ECF No. 25-33 at 258.) The jury returned true findings that Petitioner was armed with and personally used a 9mm semi-automatic firearm, and that Withers was not armed with and did not personally use a 9mm semi-automatic firearm. (*Id*.)

On June 17, 2014, at a bifurcated bench trial, the court made true findings on all prior conviction allegations as to both defendants. (*Id*. at 260.) On January 21, 2015, a

hearing was held on Petitioner's motion to substitute his appointed public defender for new counsel for the purpose of filing a new trial motion.  (*Id*. at 264.)  The court denied that motion, as well as his motions for a new trial and to strike his priors.  (*Id*.)  On January 28, 2015, he was sentenced to 25 years to life on the first-degree murder count, tripled as a result of his two prior strikes, plus a consecutive term of 25 years to life for the firearm enhancement, for a total of 100 years to life in state prison.  (*Id*. at 263-64.)

Petitioner appealed, raising claims one though seven presented here.  (ECF Nos. 25-35, 25-36 and 25-37.)  The appellate court consolidated his appeal with Withers' and affirmed.  (ECF No. 25-38, *People v. Withers, et al.*, No. D067156/D067470, slip op. (Cal.App.Ct. Sept. 26, 2016).)  He presented the same claims in a petition for review in the California Supreme Court (ECF No. 25-39) which was summarily denied on January 18, 2017.  (ECF No. 25-40.)

Petitioner raised claims eight through twelve presented here in a habeas petition filed in the superior court on August 31, 2017 (ECF No. 25-41), and in the appellate court on October 30, 2017 (ECF No. 25-43), which were both denied on procedural grounds.  (ECF No. 25-42, *In re McCreary*, No. NCN1500, order (Cal.Sup.Ct. Sept. 6, 2017); ECF No. 25-44, *In re McCreary*, No. D073026, order (Cal.App.Ct. Oct. 31, 2017).)  He then raised those same claims in a state supreme court habeas petition.  (ECF No. 25-45.)  The petition was denied on February 14, 2018, with an order that stated: "The petition for writ of habeas corpus is denied on the merits. (See *Harrington v. Richter* (2011) 562 U.S. 86, citing *Ylst v. Nunnemaker* (1991) 501 U.S. 797, 803.)"  (ECF No. 25-46, *In re McCreary*, No. S245567, order (Cal. Feb. 14, 2018).)

Petitioner filed a second round of state habeas petitions in the superior court on April 13, 2018 (ECF No. 25-47) and in the appellate court on May 23, 2018 (ECF No. 25-49), raising, among other claims, claim fourteen here, which were both denied on procedural grounds.  (ECF No. 25-48, *In re McCreary*, No. HCN1519, order (Cal.Sup.Ct. Apr. 19, 2018); ECF No. 25-50, *In re McCreary*, No. D074018, order (Cal.App.Ct. May 25, 2018).)  He raised the same claims in a state supreme court habeas petition on July 30, 2018.  (ECF

No. 25-51.) This action was stayed pending disposition of that petition, which was denied with an order that stated: "The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th 750, 767-789 (courts will not entertain habeas corpus claims that are successive).)" (ECF No. 25-52, *In re McCreary*, No. S250337, order (Cal. Jan. 16, 2019).)

## II.  **FACTUAL BACKGROUND**

The following facts are taken from the appellate court opinion affirming Petitioner's convictions on direct appeal.

### A.  *The People's Case*

#### 1.  *The Del Dios drug apartment*

Jonathan Nick Griffith, a drug user and dealer, testified for the prosecution under a grant of immunity.  He had convictions for auto theft, drug possession, and being under the influence.  At the time of trial in this matter, Griffith was in custody for a parole violation for possessing methamphetamine.

Griffith testified that he shared a "crash-pad" apartment (the Del Dios apartment) with a man he identified as "Vid" at an apartment complex on Del Dios Highway in Escondido that was a regular place for people to come by, hang out, and take drugs.  Griffith's bedroom was the "party spot."  Griffith had known McCreary, whose nickname is "Lucky," for 20 years and they were close friends.  McCreary came by the apartment four or five times each week, and Griffith often gave him methamphetamine because they were friends.

McCreary often carried a semiautomatic .45-caliber handgun, and he owned a bulletproof vest.  McCreary acted as an "enforcer" for Griffith in connection with Griffith's various illegal activities.

David "Weasel" Renteria and Vid were friends, and Renteria would regularly hang out at the Del Dios apartment and use drugs.  Renteria was a Chula Vista gang member who had been to prison for committing several assaults, including one on a police officer, and for auto theft.  He was about six feet two inches tall and weighed about 230 to 240 pounds.  Renteria was about two inches taller than Withers, and he was about five inches taller than McCreary and outweighed him by about 80 pounds.

4

2. *McCreary meets the victim, Rodriguez, on January 28, 2012, and brings her to the Del Dios apartment*

In early 2012 McCreary had a crush on Jackie "Looney" Bravatti. [Footnote: The principal events from which this case arose occurred during a five-day period from January 28 to February 1, 2012, the day Rodriguez was fatally shot. All further dates are to calendar year 2012 unless otherwise specified.] On January 28 Bravatti called McCreary and asked him to pick up Denise Rodriguez and her baby. Although McCreary did not know Rodriguez, he did as Bravatti asked, and he and Griffith drove Rodriguez and her baby to the Del Dios apartment.

McCreary and Griffith left the apartment to buy beer and when they returned Rodriguez and Renteria were in the bathroom having sex. Rodriguez and Renteria used methamphetamine together and then had sex several more times that night. The next morning Renteria told Rodriguez he was married and then he left the apartment.

After Renteria left, Griffith saw Rodriguez crying hysterically on the bed. Griffith asked her what was wrong and attempted to console her by offering her something to calm her nerves.

Griffith testified he later heard from McCreary and Withers that Rodriguez was claiming Renteria had forcibly raped her. Griffith indicated he knew Renteria had not raped Rodriguez because he had heard Renteria and Rodriguez while they were having sex in the bathroom.

3. *Withers meets Rodriguez at the Del Dios apartment on January 29*

Withers met Rodriguez at the Del Dios apartment on January 29, the day after she arrived there, when he came to the apartment complex to buy methamphetamine from Griffith. Rodriguez told Withers and McCreary she had been forcibly raped, but she did not say who had raped her.

Withers drove Rodriguez and her baby from the Del Dios apartment to his house. Kassandra Barr and Leila Penman were at Withers's house when Withers and Rodriguez arrived there. Rodriguez and the baby stayed at Withers's house with Penman. In Withers's presence Rodriguez told Penman that someone had given her a "hot shot" (bad drugs that caused her to pass out) and that men had taken turns raping her. Rodriguez later appeared to give an inconsistent story by telling Penman that one of the people who raped her was her boyfriend (Renteria).

Meanwhile, Withers and Barr left to see Christina Thornbrough and her then-boyfriend, Gary Cross. After Withers told them Rodriguez had been raped, she was in danger, and she and her baby needed to stay in a safe place somewhere, Cross and Thornbrough agreed to let Rodriguez and her baby stay at Thornbrough's house, where Cross was living.

### 4. *Withers was a trained street fighter*

Cross testified that Withers was a big, formidable guy who was very good at street fighting. Withers trained as a street fighter and did mixed martial arts. Cross referred to Withers as "Captain Save-a-Ho" because of his willingness to help women. According to Cross, the help Withers provided to women included being an "enforcer," which he did in lieu of calling the police to "square things." After Cross's niece, Michelle Lentz, was beaten by her boyfriend, Cross called Withers to protect her. Withers beat up the boyfriend and later assured Lentz the boyfriend would never bother her again.

### 5. *Withers's investigation regarding Rodriguez's rape and bad drugs allegations*

On January 30 - the day after Thornbrough and Cross agreed to let Rodriguez and her baby stay the night with them - Withers, Barr, and Withers's friend, Christopher ("Mexican Chris"), picked Rodriguez up from Thornbrough's house and took her to the Del Dios apartment to investigate her claim she had been given bad drugs and raped. Rodriguez left her baby with Thornbrough. Barr stayed in the car while Withers, Rodriguez, and Mexican Chris went inside the apartment. Rodriguez, who was crying, sat on the couch. Withers, who appeared to be looking for Renteria and was saying he wanted to get justice, angrily went down the hall to the master bedroom, where he met with McCreary, Griffith, Griffith's girlfriend Phoneny Sitaket, Mexican Chris, and Vid. Withers eventually calmed down, but still seemed concerned when Griffith told him Renteria had not raped Rodriguez. Griffith indicated that he had heard Renteria and Rodriguez having sex in the bathroom and that it was consensual.

Rodriguez continued to cry in a dramatic and exaggerated way and appeared to be seeking attention. At some point Withers's truck was towed because he had parked in a fire lane, and McCreary drove him and Barr to the tow yard. Rodriguez remained at the Del Dios apartment while Withers spent a long time recovering his impounded truck.

/ / /

6

### 6. *Rodriguez calls Renteria to ask for a ride from the Del Dios apartment to her parents' home*

That same day, January 30, while Withers was trying to recover his truck, Rodriguez telephoned Renteria and asked him to give her a ride. Renteria picked up Rodriguez from the Del Dios apartment and drove her to Thornbrough's house. When they arrived, Renteria went inside to get the baby and then drove Rodriguez and her baby to Rodriguez's parents' apartment. Renteria went inside with Rodriguez, met her parents, and talked with her father. Renteria had locked his keys in his car. When he and Rodriguez's father were unable to unlock it, Renteria left the car where it was and took a taxi home.

### 7. *Withers's retaliatory theft of Renteria's car*

The next day, January 31, with the assistance of Gerald Gallentine, Withers and Rodriguez stole Renteria's car from the parking lot where Renteria had left it the day before. Griffith testified that Withers "took (the car) from (Renteria) for raping (Rodriguez), or supposedly raping (her)." Gallentine testified that Rodriguez said that the car they were taking belonged to her boyfriend (Renteria) and that he would be angry when he found out. Gallentine also testified that Rodriguez gave Withers permission to take the car and that he (Gallentine) did not believe they were stealing Renteria's car. Rodriguez also said her boyfriend would know she took the car because she knew his keys were inside it. According to Gallentine, Withers told him not to worry because the guy had done something bad to Rodriguez.

Rodriguez rode with Withers in Renteria's car to Gallentine's house as Gallentine followed them in his car. Later they went to Withers's house. When they arrived, McCreary and Griffith were in Withers's master bedroom with Barr. Withers told Rodriguez to remain in the living room with Gallentine, and then he went into his bedroom and smoked methamphetamine with McCreary and Griffith. Rodriguez walked into the bedroom and, when she saw McCreary and Griffith, she became angry and started screaming at McCreary that she had been given bad dope and had been raped.

Withers asked Gallentine to take Rodriguez out of the bedroom and take her home. Rodriguez would not calm down and she continued screaming and yelling. Withers told Rodriguez, "Shut the fuck up." He told Gallentine, "Get rid of this bitch. Get this bitch out of here." Gallentine testified he did not want Rodriguez in his car, so he left Withers's house without her.

Rodriguez told Withers he should not have stolen Renteria's car, and Withers replied, "What do you mean? You're the one that told me to do this." Rodriguez continued to scream and yell, and then tried to leave, but Withers shoved her against a wall. He then took her into a bathroom for about 20 minutes.

Renteria went back with his wife to get his car from the parking lot where he had left it after locking the keys inside, but discovered it was gone. Renteria called Rodriguez, who told him, "Oh, I think you're going to be mad." Renteria testified that Withers then got on the phone, brought up Rodriguez's claim that Renteria had raped her, and told Renteria he had stolen Renteria's car in retaliation for Renteria's supposedly raping Rodriguez.

8. *Rodriguez's murder on February 1 and McCreary's disposal of her body*

Later that same day, January 31, McCreary texted Withers, "(I'm) in negotiations on a *throw away*, too little advanced notice for anything clean and my personal takes too long to clean and assemble which is why I don't usually pack backups. (T)here will be rental, but I'll throw in $60 cash towards that." (Italics added.) At trial, an investigator for the district attorney's office testified that the term "throw away" means an untraceable gun.

That night Withers drove McCreary and Rodriguez in Withers's Mercedes to the Mount Vernon Inn. They went into a room occupied by Joshua Rayborn, Rayborn's girlfriend, Monica Rodriguez (Monica), and Monica's friend, Christopher Harris. They all smoked methamphetamine. At some point something angered Withers and he threw the meth pipe they were smoking against a wall.

Sometime after midnight, February 1, Withers and McCreary left the Mount Vernon Inn and Withers drove them in his Mercedes to the Del Dios apartment to confront Renteria. Rodriguez remained at the Mount Vernon Inn with Rayborn, Monica, and Harris.

Outside the Del Dios apartment, Withers and McCreary prepared themselves to beat Renteria. Withers texted Griffith to send Renteria outside, but Renteria refused to go outside.

Withers and McCreary eventually went inside the Del Dios apartment and spoke with Renteria. Griffith and Renteria were able to convince Withers

and McCreary that Renteria had not raped Rodriguez, that she had consented to having sex with Renteria. Withers promised to return Renteria's car, apologized to Renteria, and they shook hands.

Renteria testified he heard Withers call the Mount Vernon Inn and say either, "Put that bitch in a corner" or "Put that bitch on the phone." Withers was now angry that Rodriguez had lied to him about being raped. Renteria testified that after Withers's phone call ended, he heard McCreary say to Withers, "I got it" or "I'll take care of it." Withers and McCreary left a few minutes later.

Withers and McCreary returned to the Mount Vernon Inn in Withers's Mercedes and got Rodriguez. Withers grabbed Rodriguez by her arm and put her in his car. Withers then got back into his car and, with McCreary sitting in the front passenger seat and Rodriguez in the backseat, he drove away from the Mount Vernon Inn.

Rodriguez was screaming and yelling, and she tried to open the car door and get out. McCreary turned around and fired four gunshots into Rodriguez.

After McCreary shot Rodriguez, Withers drove McCreary and Rodriguez's body to Withers's home. Withers went inside and came back out carrying a blanket. Barr, who was staying in Withers's home, testified she saw Withers's Mercedes in the driveway with the engine idling. Barr overheard Withers, who had exited the car and walked over to the passenger's side, tell McCreary, who had moved over into the driver's seat, "Take the car" and "clean that mess." Barr had seen Withers walk out of the house and to the Mercedes with the blanket, and she saw him put the blanket in the car through the front passenger-side window. Withers told McCreary he would contact him later.

McCreary then drove Withers's Mercedes to an undeveloped cul-de-sac on Lawrence Welk Court and left Rodriguez's body there. McCreary texted Withers and told him, "I have the spot, it'll be perfect." Someone passing by on a bicycle found the body, which was wrapped in a green blanket, and called 911.

9. *Testimony of Ming and additional testimony of Gallentine*

Ming, a prosecution witness who was in custody for stealing an automobile and was testifying pursuant to a cooperation agreement with the district attorney's office, testified that he met Withers while in custody and

18cv0789-CAB (BGS)

that his cell was catty-corner from Withers's and they could see each other from their cells. He would speak with Withers during free time in the common area. Withers spoke to Ming "a lot," almost every day, about his involvement in Rodriguez's murder. Withers told Ming he was angry at Rodriguez for lying to him about being raped. Withers indicated to Ming that there was a plan to kill Rodriguez, but Withers told Ming, "The bitch wasn't supposed to get shot in my backseat." Withers told Ming that he asked McCreary on numerous occasions to "man up" and take the blame.

Ming also testified that Withers asked him to lie on his behalf by falsely telling Withers's investigator that he ran into McCreary on the streets after the shooting, McCreary was "strung out on drugs," and McCreary told him, "Hey, I just shot this chick in the back of (Withers's) car. (Withers) had no idea about it." Ming further testified that Withers told him he grabbed Rodriguez by her arm and put her in his car.

During the trial in this matter, Gallentine, like Ming, was in custody and testified for the prosecution pursuant to a cooperation agreement with the district attorney's office. Gallentine testified that when McCreary drove Withers's Mercedes to Gallentine's house and Gallentine agreed to take possession of the car, McCreary spoke to him about someone's having been murdered in the car, but McCreary did not tell Gallentine who had been murdered. McCreary showed Gallentine a bullet hole in the car. McCreary asked Gallentine, "Did (Withers) tell you what's up?" Gallentine testified that when he asked McCreary what he meant, McCreary replied, "I blasted somebody in the back" or "I blasted someone in the backseat."

Gallentine also testified he was taken into custody in July 2013, and he indicated that his cell was near Withers's. While they were in custody, Withers asked Gallentine to lie on his behalf. Specifically, Withers asked him to tell Withers's investigator that when McCreary came to his house, McCreary said, "I shot this girl; Withers didn't know anything about it." Gallentine testified that he got the impression from talking with Withers that Withers was in the car when Rodriguez was killed. Gallentine also testified that Withers told him Rodriguez was trying to open the car door and get out of the car before she was shot.

10. *Defendants' arrests and their recorded incriminating statements*

Shortly after midnight on February 2, Withers was detained during a traffic stop and following a search of his vehicle and his person he was arrested for being a felon in possession of ammunition. Later at the police

station Withers calmly told the arresting officer he wanted to provide information about a homicide. Escondido police detectives were notified.

On February 3 Withers placed a recorded and transcribed telephone call to McCreary, who implicated himself as the person who shot Rodriguez. During the call, Withers asked McCreary about his (Withers's) car. Withers then asked McCreary, "You didn't put fuck, you didn't put any bullet holes in my shit, did you?" McCreary replied, "There, there, there was, there was one, that, um, I, I, I started working on it . . . ." Withers then confronted McCreary about the four gunshots McCreary fired inside Withers's Mercedes during the murder: "Fuck, you didn't have to fuckin' shoot four fuckin' times, idiot. That was crazy." McCreary replied: "No, no I didn't. I didn't. I know, I know I don't either. Um, I used to do a real quick double but uh, um . . . I don't know, I don't know what happened." Indicating he (Withers) was driving when McCreary shot Rodriguez, Withers then told McCreary: "Yeah I (was) fucking . . . driving on the fuckin' side of the road and all of a sudden you fucking pop four rounds, I was like holy shit." McCreary responded by laughing.

McCreary was arrested the next day, February 4, while he was driving Withers's other vehicle, a Ford Explorer. [Footnote: Police detectives found Withers's Mercedes at Gallentine's house. Gallentine testified that McCreary unexpectedly brought the Mercedes to his house after Withers was arrested, and Gallentine allowed McCreary to take Withers's Ford Explorer, which was in Gallentine's possession.] One of the arresting officers, San Diego County Sheriff's Deputy Juan Lozoya, testified that when he activated the red emergency lights and siren on his unmarked vehicle, the Ford Explorer McCreary was driving swerved and accelerated during what Deputy Lozoya indicated were evasive maneuvers. When McCreary accelerated again and turned into the driveway of an apartment complex, both wheels on the passenger side of the Ford Explorer came off the ground. McCreary stopped when the Explorer bounced back on all four wheels and approached a rolling wrought iron gate.

The officers instructed McCreary, who was looking outside the driver's side door of the Explorer, to get on the ground but McCreary did not comply. McCreary resisted as the officers pulled him out of the Explorer and onto the ground, and he continued to struggle after he was on the ground. Deputy Lozoya testified that when McCreary went down to the ground, he pulled both of his hands in towards his waistband and underneath his stomach as he lay face down on the ground. Deputy Lozoya instructed McCreary to get both of his hands out and behind his back. Deputy Lozoya grabbed McCreary's left

18cv0789-CAB (BGS)

hand and attempted to pull it out from under McCreary, but McCreary continued to resist.

Eventually the officers were able to subdue and handcuff McCreary. One of the officers, who was conducting a pat down of McCreary's person, asked McCreary whether he had any weapons on him, and McCreary replied, "The gun's in the car."

11. *Ballistics evidence*

Expert testimony by a criminalist established that the nine millimeter FEG semiautomatic handgun the police found in the Ford Explorer McCreary had been driving immediately prior to his arrest matched the bullets that were recovered from Rodriguez's body.

12. *Autopsy and forensic re-creation of the shooting*

Bethann Schaber, M.D., a forensic pathologist, testified that an autopsy determined the cause of Rodriguez's death was multiple gunshot wounds to her upper torso. Specifically, three bullets entered Rodriguez's body through the back of her right shoulder and went through her chest cavity, injuring both of her lungs and large blood vessels coming off of the heart, including the aorta and the pulmonary artery. One of the bullets went through her spine. Two of the bullets were found inside Rodriguez's body, and one was found at the scene when it fell out of Rodriguez's clothing and stayed after exiting her body.

Working with a criminalist from the San Diego County Sheriff's Regional Crime Lab who was a firearms expert, Dr. Schaber participated in a simulated re-creation of the shooting inside the Mercedes to determine Rodriguez's position when she was shot. Dr. Schaber testified that she handled the body positioning aspect of the re-creation, and the firearms expert handled the bullet trajectory aspect. A female model, who pretended to be Rodriguez and whose height was about the same as Rodriguez's, sat in the back seat of the Mercedes during the re-creation of the shooting. Dr. Schaber determined that in order for Rodriguez to be shot through the back of her right shoulder by someone in the front passenger seat, she had to be twisted to some degree in her upper body towards the car door. Dr. Schaber indicated it was possible Rodriguez was holding onto the door handle when she was turned towards the door and was shot.

### B. *Defenses*

Withers and McCreary both testified. Each indicated there was no plan to kill Rodriguez when she got into Withers's Mercedes with them and they left the Mount Vernon Inn. They both indicated Rodriguez willingly got into the Mercedes. Each testified that the other shot Rodriguez, who was in the back seat, from the front passenger seat. Each indicated that the other's shooting of Rodriguez was unexpected and that they each feared the other after Rodriguez was shot.

(ECF No. 25-38, *People v. Withers*, *et al*., No. D067156/D067470, slip op. at 5-18.)

## III.  **PETITIONER'S CLAIMS**

(1)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated by the denial of his motion to substitute counsel for a new trial motion. (ECF No. 19 at 6.)

(2)  Petitioner's Fourteenth Amendment right to due process was violated by the inadvertent introduction of evidence he had been in prison. (*Id*. at 7.)

(3)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated because the verdict form states the jury found he personally used a firearm, whereas he was charged with and sentenced for personally and intentionally discharging a firearm, and there was no jury finding of intentionality. (*Id*. at 8.)

(4)  Petitioner's Fourteenth Amendment right to due process was violated by the refusal of the sentencing judge to dismiss his two strike priors which arose from the same conduct on the same day twenty-three years earlier. (*Id*. at 9.)

(5)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated when the trial judge referred the jury to their instructions rather than further instructing them in response to their question whether the failure to help a victim who dies constitutes aiding and abetting murder. (*Id*. at 10.)

(6)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated because there is insufficient evidence of kidnapping. (*Id*. at 11.)

(7)  Petitioner's Fourteenth Amendment right to due process was violated by the prosecutor's delay in disclosing Jason Ming's testimony to the defense. (*Id*. at 12.)

(8)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated by ineffective assistance of trial counsel in failing to call Roxanne Chavez to testify the murder weapon belonged to Withers and he was the shooter.  (*Id.* at 13.)

(9)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated "by the prosecutor's cumulative misconduct and multiple trial errors" and trial counsel's failure to object and request the jury be admonished.  (*Id.* at 14.)

(10)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated by the prosecutor's knowing use of false testimony regarding the manner of death, and by trial counsel's failure to object and request a mistrial.  (*Id.* at 15.)

(11)  Petitioner's rights under the Sixth and Fourteenth Amendments "were violated when the jury heard improper illegal prejudicial evidence of serious prior prison terms," and by his trial counsel's failure to object or request a mistrial.  (*Id.* at 16.)

(12)  Petitioner's rights under the Sixth and Fourteenth Amendments were violated by ineffective assistance of counsel when his trial attorney failed to present argument or evidence at his sentencing hearing.  (*Id.* at 17.)

(13)  Petitioner's Fourteenth Amendment right to due process was violated by the failure of the state habeas courts to hold an evidentiary hearing.  (*Id.* at 18.)

(14)  Petitioner's rights under the Fifth, Sixth and Fourteenth Amendments were violated because he is actually innocent.  (*Id.* at 19-20.)

## IV.  **DISCUSSION**

For the following reasons, the Court finds only claim three procedurally defaulted, and that neither an evidentiary hearing nor a Certificate of Appealability are warranted. The Petition is denied because the state court adjudication of Petitioner's claims is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.

### A.    **Standard of Review**

To obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court

adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2019). Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred in order to obtain relief. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. To satisfy § 2254(d)(2), a petitioner must show the factual findings relied upon by the state court are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## B. Claim One

Petitioner alleges in claim one that his rights under the Sixth and Fourteenth Amendments were violated by the denial of his *Marsden*[1] motion to relieve his appointed public defender after trial and appoint new counsel to file a new trial motion. (ECF No. 19 at 6.) The trial judge conducted a *Marsden* hearing at which Petitioner's public defender identified five issues Petitioner wanted to raise on a new trial motion: (1) trial counsel refused to call Roxanne Chavez to testify the gun belonged to Withers and he was the

---

[1] *People v. Marsden*, 2 Cal.3d 118, 123 (1970) (holding that a defendant represented by appointed counsel or the public defender may request the court discharge the attorney and substitute new counsel if the defendant's right to counsel would be substantially impaired by continuing with the original attorney).

shooter, (2) Petitioner belatedly recognized a juror as a customer of a store where Petitioner once worked as someone who may have harbored ill will toward him, (3) the prosecutor inadvertently showed the jury an unredacted transcript of Petitioner's police interview and inadvertently played the corresponding audio for the jury where a reference was made to him having served time in prison, and although trial counsel objected she failed to ask the court to admonish the jury, (4) trial counsel did not object or seek an admonition when the prosecutor reenacted in an excessively emotional manner during closing argument what the victim was doing and saying in the back seat of the car, and (5) trial counsel failed to object to evidence regarding how quickly the victim died on the basis it conflicted with a stipulation at the preliminary hearing she died immediately when shot. (*See* ECF No. 25-38, *People v. Withers*, *et al.*, No. D067156/D067470, slip op. at 40-41.) Petitioner said he also wished to raise claims his trial counsel had not communicated with him sufficiently to prepare him to testify and did not provide him with one of his prior statements until shortly before he was cross-examined so his testimony would not appear rehearsed. (*Id*. at 42.) Trial counsel said she made tactical decisions in all those respects but could not "very well file a motion to protest my own strategic decision," and she recommended that new counsel be appointed because new counsel "could possibly review the same information" and find a basis to file a new trial motion. (*Id*. at 41.)

Respondent answers that the state appellate court rejection of claim one, on the basis the trial court conducted an adequate hearing where it heard all grounds on which Petitioner wanted to file a new trial motion and found no basis for a new trial and no ineffective assistance of counsel, is objectively reasonable within the meaning of 28 U.S.C. § 2254(d). (ECF No. 24-1 at 31-42.)

Petitioner presented this claim to the state supreme court in his petition for review. (ECF No. 25-39 at 7-11.) That petition was summarily denied without citation of authority or a statement of reasoning. (ECF No. 25-40.) The claim was also presented to the state appellate court on direct appeal. (ECF No. 25-35 at 33-53.) The claim was denied on the merits in a written opinion affirming the conviction. (ECF No. 25-38.)

There is a presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991). As no basis to rebut that presumption appears in the record, the Court will look through the silent denial by the state supreme court to the appellate court opinion on direct appeal as to claims one through seven. As to claim one, the appellate court stated:

> McCreary contends the court erred in denying his postverdict motion for the appointment of new counsel to represent him in bringing a motion for a new trial. We reject this contention.
>
> 1. *Background: McCreary's Marsden motion and his related motion for new counsel to represent him in presenting a new trial motion*
>
> In late January 2015, about six months after the jury returned its verdicts and shortly before McCreary's sentencing hearing, the court conducted a *Marsden* hearing at the request of McCreary's trial counsel, Cassandra Kinchen. (1MCT 76 (6/13/14 verdicts); 2MCT 560 (1/28/15 sentencing); 3RT 2388:8-9; 30RT 4000:13-18; see RT vol. 30-A ("30-ART") 4001-4026 (sealed RT of *Marsden* hearing in reddish-orange envelope in McCreary's doghouse)). Both McCreary and Kinchen were present; the prosecutor was not. McCreary indicated he wanted the court to appoint new counsel to represent him, and he told the court Kinchen would not do "a few things" he wanted her to do.
>
> At the court's invitation and with McCreary's acquiescence, Kinchen then spoke on McCreary's behalf and informed the court that he wanted her to file a motion for a new trial based on several grounds, but she had conducted an investigation and had decided not to pursue such a motion. The court asked Kinchen, "Why is that, because you feel there is no legal merit or what?" Kinchen responded, "Well, I can't say no legal merit. I would simply say strategic decisions would indicate I would not have used certain information."
>
> Kinchen then described the five principal issues McCreary wanted to raise in a new trial motion: (1) a defense witness Kinchen knew about but decided not to call at trial came forward after the verdict with additional information McCreary thought was important; (2) as the jury was about to return its verdicts following the month-long trial, McCreary belatedly recognized one of the male jurors, whose name he did not know, as a customer with whom he had interacted at a store where he had worked, and who

McCreary believed might have harbored ill will towards him; (3) Kinchen objected but, for tactical reasons, did not ask the court to admonish the jury during the prosecutor's cross-examination of McCreary near the end of the trial when the jury was mistakenly shown an unredacted transcript of his police interview and heard the corresponding audio recording that made one reference to McCreary's having served time in prison; (4) Kinchen did not object and seek an admonishment during the prosecutor's closing arguments when the prosecutor reenacted, in a manner McCreary thought was overly passionate, what the prosecutor thought the victim, Rodriguez, was doing and saying in the back seat of Withers's car; and (5) Kinchen failed to object to evidence at trial regarding how quickly Rodriguez died, which differed from a stipulation at the preliminary hearing that she died immediately when she was shot.

Kinchen then told the court, "(M)y decision not to file a motion for new trial is based on my investigation, and also my interpretation of the information." She stated that her "not objecting, not having the jury admonished that close to the end of trial was a strategic decision." She explained, "I can't very well file a motion to protest my own strategic decision. However, another attorney could possibly review the same information and decide to proceed with the information. They could decide to proceed with that witness, when I did not. They could decide that the jury should have been admonished when I did not. (¶) (F)or that reason, I can't file a motion, but perhaps another attorney can."

The court asked McCreary whether Kinchen had "cover(ed) the grounds" he believed required the filing of a new trial motion. McCreary replied, "It was perfect." The court then asked McCreary, "So she's a good attorney?" McCreary answered, "Yes."

The court then asked Kinchen about her qualifications and experience as a criminal defense attorney. Kinchen replied that she had worked about 24 years as a criminal defense attorney for the public defender's office, and she had done at least 100 trials.

In addition to the five grounds he asserted for a new trial motion, McCreary also complained that Kinchen had not communicated enough with him prior to trial to prepare him for testifying, and he disagreed with Kinchen's decision not to provide him with one of his statements until shortly before his cross-examination by the prosecutor so that his testimony would not appear rehearsed.

18cv0789-CAB (BGS)

The court solicited additional information from both Kinchen and McCreary regarding McCreary's *Marsden* request for appointment of new counsel. Kinchen informed the court she had discussed McCreary's testimony with him before he testified, she went over the areas she would go into on direct examination, and she let McCreary know the prosecutor's cross-examination would be "pretty aggressive" if he chose to testify. She reminded McCreary he should "stick to the truth as to what the story was."

Regarding the first of the five grounds McCreary was asserting in support of his request for the appointment of new counsel for the purpose of bring a new trial motion - Kinchen's decision not to call a witness McCreary thought she should have called - McCreary told the court he did not recall whether Kinchen explained her reasons for not calling the witness.

Regarding his second claimed ground for a new trial motion, McCreary acknowledged that during jury selection he did not recognize the juror he said he recognized after trial when the jury was about to return its verdicts. Kinchen informed the court that McCreary first told her about the juror after the verdict came in. Kinchen indicated that she followed up and two investigators interviewed the juror, who acknowledged he was a customer at the store where McCreary had worked, but stated he did not recall having any interaction with McCreary and he did not recognize him. Kinchen also informed the court the juror told the investigators that he did not know anybody at the store and that he was very attentive about who the parties in this case were because he was looking for any reason to get off the jury and he could not find one. McCreary, however, told the court, "I think over a period of seeing the guy every week for several years, he would build a bad opinion of me." Kinchen added that her investigators questioned the juror, and he said he did not know anyone at the store.

The court turned to McCreary and, referring to his request for the appointment of new counsel for the purpose of bring a new trial motion, told him, "So that creates a problem for what your request is; okay?" McCreary replied, "Yes, sir." The court explained: "There's . . . a problem with that in the sense that you didn't bring this to anybody's attention until the verdict was read, or right before the verdict was read." The court added, "I'm kind of concerned about the fact that you sat here for over a month and never brought it to anybody's attention."

Shortly thereafter, the court told McCreary, "(Y)our contact with that guy was so minimal that you sat here in the same courtroom with a guy who would decide your fate for over a month and (you) didn't recognize him. So

18cv0789-CAB (BGS)

that creates some concern for me that if there was all this ill will that he harbored towards you, you would have immediately said, 'Oh, my gosh. We have to get that guy off the jury because he doesn't like me.' And that never happened during jury selection (or) during the entire course of the trial."

Regarding the third ground - Kinchen's tactical decision to not ask the court to admonish the jury when it heard near the end of the trial one reference to McCreary's having served time in prison - Kinchen explained to the court that, although she objected, in her opinion "it was too late in the trial" to ask that the jury be admonished. Indicating agreement with Kinchen's statement, the court observed that lawyers in similar situations frequently "weigh out in their head, 'Okay. Do I want to make a motion to strike and draw attention to it? It might not have been something anyone even saw. Or let it slide and not draw attention to it."

The court then addressed McCreary's fourth asserted ground for a new trial: Kinchen's failure to object and ask that the jury be admonished during the prosecutor's closing arguments when the prosecutor reenacted what she thought Rodriguez was doing and saying in the backseat of Withers's car. The court stated it believed the prosecutor's argument was based on someone's testimony, and it observed attorneys commonly "get passionate when they make their arguments." Kinchen told the court McCreary's concern was that there was no testimony regarding what Rodriguez said in the backseat of the car before she was shot and that the prosecutor "made it up."

Prompted by the court, Kinchen acknowledged the prosecutor's reenactment occurred during the prosecutor's closing argument. The court then told Kinchen and McCreary, "(W)hat the attorneys say is not evidence in opening and in closing." Kinchen responded, "Well, (McCreary) has a concern that the jury was not notified that what was said during the (prosecutor's) closing was not evidence." The court replied, "Oh no. I instructed them multiple times (that) what attorneys say is not evidence. I do that in every trial, and it's one of the actual jury instructions that I read to the jury." [Footnote: The court instructed the jury under CALCRIM No. 222 that "(n)othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."] When the court started looking at the jury instructions it gave in this case, McCreary said, "I believe you, Your Honor."

The court also addressed McCreary's fifth and last asserted ground for a new trial: Kinchen's failure to object to trial evidence regarding how quickly Rodriguez died, which differed from a stipulation at the preliminary hearing

that she died immediately when she was shot. Kinchen argued that, at trial, the prosecutor violated the preliminary hearing agreement about how quickly Rodriguez died, adding that the prosecutor "went with" what Kinchen asserted was Withers's testimony that Rodriguez did not die immediately. Indicating it did not see how McCreary was prejudiced, the court told Kinchen, "I imagine the stipulation was for purposes of preliminary examination and any motions that flowed therefrom." Kinchen replied, "Correct." Noting that the "stipulation was a limited stipulation that was designed only to get through the preliminary hearing," the court explained that "there's no legal grounds . . . by which I could hold the (prosecutor) to that stipulation for purposes of trial when it was . . . only limited to the preliminary hearing." Indicating that all of the four prior asserted grounds for the new trial motion McCreary wanted to bring were insufficient, the court stated with respect to the fifth ground, "So that's insufficient grounds as well."

a. *Court's findings and rulings on McCreary's two postverdict motions*

i. *McCreary's Marsden motion*

The court first ruled on McCreary's *Marsden* motion, which was based on his general claim that the representation Kinchen had provide him was inadequate. Still outside the presence of the prosecutor, the court explained that "(r)ight now the issue of the *Marsden* hearing is whether (there are) sufficient grounds to appoint other counsel based on (Kinchen's alleged) incompetence, inadequate representation, failure to properly investigate, having contrary interest in Mr. McCreary . . . ."

The court denied McCreary's *Marsden* motion, noting that Kinchen was "a very experienced trial lawyer" who had "devoted her career to criminal defense." The court found that Kinchen "was not incompetent in any way," and she "more than adequately represented (McCreary)." The court also found Kinchen had "completely investigat(ed) everything." As an example, the court noted that when McCreary told Kinchen about the juror he claimed he belatedly recognized, "(s)he sent an investigator out to the (juror's) house," the juror "sent (the court) a letter because of it," and she "subpoenaed documents from the store" where McCreary worked and allegedly had interracted with the juror. The court told McCreary that Kinchen had "aggressively represented you throughout the trial." The court then reviewed some of the incriminating evidence supporting the jury's finding that McCreary was the shooter. Stating that Kinchen "was handed a case with the evidence and the facts that she can't change," the court found she "did an excellent job with what she had to work with."

ii. *McCreary's motion for appointment of new counsel to represent him in bringing a motion for a new trial*

After denying McCreary's *Marsden* motion, the court told Kinchen, "(T)he next question is do we appoint counsel to file a motion for new trial that you can't file because of a conflict?" Seeking clarification the court asked her, "So it's your position then that for a motion for new trial to be filed, it would have to be investigated by new counsel to determine if there was ineffectiveness of counsel; correct?" Kinchen replied, "Correct, based on their assessing the evidence in a different way than I assessed (it)." Following further discussion with Kinchen and McCreary regarding the five grounds for a new trial that he was asserting, the court recessed the hearing for a few minutes in order to bring back the prosecutor. [¶] When the prosecutor returned, the court told her that "(McCreary's) *Marsden* motion ha(d) been denied" and "(t)he next issue (was) whether or not the Court should appoint substitute counsel to investigate certain issues regarding considering a motion for a new trial." The court stated it had researched the issue.

Citing and discussing three cases - *People v. Sanchez* (2011) 53 Cal.4th 80, *People v. Smith* (1993) 6 Cal.4th 684 (*Smith*), and *People v. Stewart* (1985) 171 Cal.App.3d 388 (*Stewart*), disapproved on other grounds in *Smith*, at pages 694, 696 - the court denied McCreary's motion for appointment of new counsel to represent him in bringing a motion for a new trial "for the same reason" it had denied McCreary's *Marsden* motion. Noting it had heard from Kinchen, the court stated, "I won't go into detail now that we are in the presence of the prosecutor, but (McCreary) *has not made a colorable claim of ineffective assistance of counsel or any other grounds for a new trial motion*." (Italics added.) Citing *Sanchez, supra*, 53 Cal.4th 80, the court found "there was no showing during the *Marsden* hearing that would indicate in any way that (McCreary's) right to counsel has been substantially impaired, either during the trial or now that we are in a (postconviction) status." The court stated "there weren't any credibility issues or contradictory statements between (McCreary) and (Kinchen)" and Kinchen was "quite credible," and it "accept(ed) her representations and her explanations that (she) made during the *Marsden* hearing."

2. *Applicable legal principles*

a. *Ineffective assistance of counsel*

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland*,

*supra*, 466 U.S. at pp. 684-685; *People v. Frye* (1998) 18 Cal.4th 894, 979 (*Frye*).)  To establish a denial of the right to effective assistance of counsel, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687-688, 691-692; *Frye*, at p. 979.)  To demonstrate prejudice, a defendant asserting an ineffective assistance claim on appeal must show a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, at pp. 693-694; *Frye*, at p. 979.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

*Strickland* explained that "(j)udicial scrutiny of counsel's performance must be highly deferential (because) (i)t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland*, *supra*, 466 U.S. at p. 689, italics added.) *Strickland* also explained that reviewing courts "must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Ibid.*, italics added.)

b. *Substitution of new court-appointed counsel*

"Criminal defendants are entitled to competent representation.  If a defendant cannot afford to hire an attorney, one must be appointed for the defendant." (*Smith, supra*, 6 Cal.4th at p. 690.)

"The seminal case regarding the appointment of substitute counsel is *Marsden, supra*, 2 Cal.3d 118, which gave birth to the term of art, a '*Marsden* motion.'" (*Smith*, *supra*, 6 Cal.4th at p. 690.)

In *Marsden*, the California Supreme Court explained that "the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney *during the trial* is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden, supra*, 2 Cal.3d at p. 123, italics added.)  *Marsden* "established . . . that the trial court must give the defendant the opportunity to explain the reasons for desiring a new attorney." (*Smith, supra*, 6 Cal.4th at p. 690, citing *Marsden*, at pp. 123-125.)  The *Marsden* court explained that

18cv0789-CAB (BGS)

"the trial court cannot thoughtfully exercise its discretion in this matter without listening to (the defendant's) reasons for requesting a change of attorneys." (*Id*. at p. 123.)

In *Smith*, our supreme court explained that "substitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would *substantially impair the right to assistance of counsel* (citation), or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result (citation)." (*Smith, supra*, 6 Cal.4th at p. 696, italics added.) The *Smith* court stated, "This is true whenever the motion for substitute counsel is made." (*Ibid*.) Thus, it concluded, "a defendant is entitled to appointment of substitute counsel upon a proper showing posttrial or postconviction as well as pretrial." (*Id*. at p. 693.)

Of particular importance here, the *Smith* court held that "'(w)hen, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request.'" (*Smith, supra*, 6 Cal.4th at p. 693, quoting *Stewart, supra*, 171 Cal.App.3d at p. 495.) The *Smith* court also held that "'(i)f the claim of inadequacy relates to *courtroom events that the trial court observed*, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. (Citation.) If, on the other hand, the defendant's claim of inadequacy relates to *matters that occurred outside the courtroom*, and the defendant makes a "*colorable claim*" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial.'" (*Smith*, at pp. 692-693, quoting *People v. Diaz* (1992) 3 Cal.4th 495, 574, italics added.)

Quoting *Stewart, supra*, 171 Cal.App.3d at pages 396-397, *Smith* explained that a "'defendant presents a colorable claim that he was ineffectively represented at trial,'" and thus the trial court must appoint new counsel, if the defendant "'credibly establishes to the satisfaction of the court the possibility that trial counsel failed to perform with reasonable diligence and that, as a result, a determination more favorable to the defendant might have resulted in the absence of counsel's failings.'" (*Smith, supra*, 6 Cal.4th at p. 691, citing (in addition to *Stewart*) *People v. Dennis* (1986) 177 Cal.App.3d 863, 871.)

*Smith* clarified that "(w)hen the court in *Stewart*, *supra*, 171 Cal.App.3d at pages 396-397, referred to the defendant making a 'colorable claim,' it did not state a lesser standard than in *Marsden*, or create a new and different right than that stated in *Marsden*; it merely applied the *Marsden* rule to a particular factual situation, and employed somewhat different language." (*Smith, supra*, 6 Cal.4th at p. 693.)

Thus, the standard expressed in *Marsden* and its progeny and the "colorable claim" standard expressed in *Stewart* and approved in *Smith* are the same standard. (*Smith, supra*, 6 Cal.4th at p. 693.) Thus, *Smith* explained, under this one standard - whether it is referred to as the *Marsden* standard or the *Stewart* "colorable claim" standard - "substitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel (citation), or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result (citation)." (*Smith, supra*, 6 Cal.4th at p. 696.)

### 3. *Analysis*

McCreary's principal contention is that the court erred in denying his postverdict motion for the appointment of new counsel to represent him in bringing a written motion for a new trial. We reject this contention.

Citing section 1202 (discussed, *post*) and complaining that Kinchen's "refusal to file a motion for a new trial (represented) an irreconciliable conflict with (him)," McCreary first contends the court's refusal to grant his motion for appointment of new counsel to represent him in bringing a motion for a new trial "resulted in the involuntary relinquishment of (his) right to present a motion for a new trial." Without citation to any authority, he asserts "(t)he court, in refusing to appoint a conflict-free attorney who could bring such a motion, by extension also refused to hear (his) motion." This contention is unavailing.

Section 1202 provides in part: "*If the court shall refuse to hear a defendant's motion for a new trial* or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then the defendant shall be entitled to a new trial." (Italics added.)

Thus, if a trial court "refuse(s) to hear a defendant's motion for a new trial," the defendant is "entitled to a new trial" under section 1202. (§ 1202.)

On the facts presented here, McCreary's reliance on section 1202 is misplaced. The California Supreme Court has recognized that a defendant's new trial motion may be made orally. (*People v. Braxton* (2004) 34 Cal.4th 798, 814.) Here, the record of the *Marsden* hearing (discussed, *ante*) that the court conducted outside the presence of the prosecutor shows the court heard orally from both McCreary and Kinchen all of the grounds McCreary would have asserted in a written new trial motion. The court essentially heard McCreary's oral motion for a new trial and, thus, we conclude it did not "refuse to hear" McCreary's new trial motion within the meaning of section 1202.

We also conclude the court properly denied McCreary's motion for the appointment of new counsel to represent him in bringing a written motion for a new trial. As already discussed, a defendant has no absolute right to more than one appointed attorney. (*Marsden, supra*, 2 Cal.3d at p. 123.) Furthermore, "a trial court is not bound to accede to a request for substitute counsel unless the defendant makes a ""sufficient showing . . . that the right to the assistance of counsel would be substantially impaired"" if the original attorney continued to represent the defendant." (*Sanchez, supra*, 53 Cal.4th at p. 87, quoting *Marsden*, at p. 123; see *Smith, supra*, 6 Cal.4th at p. 696.)

The record of the *Marsden* hearing (discussed, *ante*) shows the court gave Kinchen and McCreary a full opportunity to present and discuss not only the five grounds for a new trial that McCreary asserted in support of his motion for new counsel to represent him in bringing a written new trial motion, but also his two additional complaints about Kinchen's performance at trial. The record also shows McCreary failed to meet his burden of demonstrating to the court that his right to the assistance of counsel would be substantially impaired if the court denied his request for new appointed counsel to represent him in bringing a written new trial motion. The record further supports the court's determination that none of the five grounds McCreary asserted was sufficient to warrant the granting of a new trial, and thus none was sufficient to warrant granting McCreary's request for new counsel.

Specifically, regarding the first ground concerning Kinchen's decision not to call the witness she knew about before trial, neither McCreary nor Kinchen, when given the opportunity, attempted to explain how the witness's testimony would have helped McCreary's defense, and McCreary informed

the court he did not recall whether Kinchen explained to him her reasons for not calling the witness.

Regarding McCreary's second asserted ground for a new trial, which concerned his claimed belated posttrial recognition of a juror he thought might have formed a "bad opinion" of him, the record shows Kinchen thoroughly investigated the issue and sent investigators to interview the former juror. In any event, the record shows the juror in question was dismissed for cause early in the trial proceedings. Specifically, on May 12, 2014, during a hearing outside the presence of the jury, Kinchen told the court, after consulting with McCreary, that the person in question had been "excused for cause" and was no longer on the jury panel. The court asked McCreary, "Is that correct(,) Mr. McCreary?" McCreary responded, "Yes, sir."

Regarding McCreary's third asserted ground concerning Kinchen's decision to not ask the court to admonish the jury when it heard near the end of the trial one reference to McCreary's having served time in prison, the record shows this was a sound tactical decision. Specifically, at the hearing on McCreary's request for new counsel, Kinchen explained to the court that, in her opinion "it was too late in the trial" to ask that the jury be admonished. Indicating agreement with Kinchen's statement, the court observed that lawyers in similar situations frequently "weigh out in their head, 'Okay. Do I want to make a motion to strike and draw attention to it? It might not have been something anyone even saw. Or let it slide and not draw attention to it."

Thus, the record shows Kinchen made a tactical decision to not request an admonishment because she did not want to draw further attention to evidence showing McCreary had served time in prison. Our scrutiny of Kinchen's performance "must be highly deferential." (*Strickland, supra*, 466 U.S. at p. 689, italics added.) As a reviewing court, we "must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Ibid.*, italics added.) We conclude McCreary has failed to meet his heavy burden of rebutting the strong presumption that Kinchen's decision to not request an admonishment was a sound trial tactic.

McCreary's fourth asserted ground also did not warrant a new trial or appointment of new counsel. As noted, McCreary claimed he was entitled to a new trial because Kinchen had failed to object and ask that the jury be admonished during the prosecutor's closing arguments when the prosecutor reenacted what she thought Rodriguez was doing and saying in the backseat

of Withers's car. The court did not err in finding this claimed ground was insufficient. The court correctly told Kinchen and McCreary that it had "instructed (the jury) multiple times (that) what attorneys say is not evidence." The record shows the court instructed the jury under CALCRIM No. 222 that "(n)othing that the attorneys say is evidence. In their opening and *closing statements*, the attorneys discuss the case, but their remarks are not evidence." (Italics added.) We presume the jury in this case understood and followed the instructions the court gave under CALCRIM No. 222 (see *People v. Brady*, *supra*, 50 Cal.4th at p. 566, fn. 9), and there is nothing in the record to rebut this presumption.

Finally, McCreary's fifth asserted ground did not warrant a new trial or appointment of new counsel. As noted, McCreary claimed he was entitled to a new trial because Kinchen failed to object to evidence at trial regarding how quickly Rodriguez died, which differed from a stipulation at the preliminary hearing that she died immediately when she was shot. Finding this was "insufficient grounds," the court told McCreary and Kinchen it did not see how McCreary was prejudiced by Kinchen's failure to object, and explained that there were "no legal grounds . . . by which (it) could hold (the prosecutor) to that stipulation for purposes of trial when it was . . . only limited to the preliminary hearing."

Based on the foregoing, we conclude McCreary has failed to show a substantial impairment of his right to the assistance of counsel. (See *Sanchez*, *supra*, 53 Cal.4th at p. 87; *Smith*, *supra*, 6 Cal.4th at p. 696.) Accordingly, we also conclude he has failed to show the court abused its discretion or violated his due process right to a fair trial in denying his motion for the appointment of new counsel.

(ECF No. 25-38, *People v. Withers*, *et al.*, No. D067156/D067470, slip op. at 39-57.)

"The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Schell v. Witek*, 218 F.3d 1017, 1025-26 (9th Cir. 2000) (en banc) (internal quotation marks omitted); *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (holding that the Sixth Amendment requires competent representation but does not guarantee a meaningful relationship between attorney and client). The Sixth Amendment requires an appropriate inquiry into the grounds for a *Marsden* motion. *Schell*, 218 F.3d at 1025 ("[I]t

is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before the case goes forward."); *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir. 1982) ("The trial court must take the time to conduct such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern.")

Petitioner can demonstrate he was denied his Sixth Amendment right to the choice of counsel by showing: (1) he made a timely request for substitution of counsel which would not have caused undue delay or inconvenience; (2) the trial court failed to make an adequate inquiry into his complaints; and (3) the conflict between him and his attorney was so great that it resulted in a total breakdown in communication which prevented an adequate defense. *United States v. Mendez-Sanchez*, 563 F.3d 935, 942 (9th Cir. 2009).

Petitioner first contended at his *Marsden* hearing that he asked trial counsel to call Roxanne Chavez as a defense witness but counsel did not do so, although Petitioner said he could not remember if he had discussed the decision not to call Chavez with counsel. The substance of her proposed testimony was not discussed at the *Marsden* hearing nor on direct appeal where she was identified as a "mystery witness." (ECF No. 25-35 at 40.) Petitioner alleges in claim eight here, which was raised on state habeas, that Chavez could have testified the murder weapon belonged to Withers and Withers was the shooter. He attached to his state habeas petition an interview report with Chavez by a defense investigator dated January 13, 2015, seven months after the verdicts were received on June 13, 2014, and about a week before the January 21, 2015 *Marsden* hearing. (ECF No 25-41 at 28.) Chavez told the investigator that when Leila Penman asked her where Petitioner kept his gun, Chavez "responded initially by saying something to the effect of, 'why would I tell you that?'" (*Id.*) Chavez then told Penman "that if it was in the car they would see it because [Petitioner] did not try to hide it," and said that she "believed that Withers was looking in the center console for the gun." (*Id.*) Defense counsel informed the court during the *Marsden* hearing that during trial she was prepared to call Chavez as a character witness, although she did not identify Chavez by her name at the hearing, and counsel said

she did not need to do so because Petitioner's criminal record had been excluded and no character witness was required, and that because Chavez was pregnant with Petitioner's child and he was married to a different woman, calling her as a witness conflicted with a defense strategy to portray him as a family man. (ECF No. 36 at 5, 12-13.) Chavez came forward with the information about the gun after trial.

Petitioner's contention Chavez could testify the gun belonged to Withers is incorrect, as she states she was asked about *Petitioner's* gun and knew where he kept it. At best, Chavez' testimony would have been cumulative to Ming's testimony that Withers admitted he was "the one who got the gun." At worst, however, her testimony would have been the only evidence the gun belonged to Petitioner, something his trial counsel attempted to avoid introducing. When Ming testified he thought the gun belonged to Petitioner, his trial counsel objected; the objection was sustained and the jury was told to disregard Ming's statement. (ECF No. 25-15 at 78.) Petitioner testified at trial he did not procure the murder weapon and it did not belong to him, and although he owned a gun it was buried and never used for criminal activity. (ECF No. 25-16 at 175-201.) He told the police the murder weapon belonged to Withers. (ECF No. 25-32 at 287.) Thus, even setting aside the issue of potential bias in favor of Petitioner based on his statement that he and Chavez were having an affair and have a child together (ECF No. 19 at 36), her testimony that Withers retrieved the gun would have been cumulative, whereas her testimony Petitioner owned the gun would have been damaging to the defense.

The state court determination Petitioner did not overcome the strong presumption that the decision not to call Chavez is a reasonable tactical one is consistent with clearly established federal law. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (recognizing a strong presumption counsel took actions "for tactical reasons rather than through sheer neglect"), citing *Strickland v. Washington*, 466 U.S. 668, 690 (1984) (holding counsel is "strongly presumed" to make decisions in the exercise of professional judgment). Nor did it create "a probability sufficient to undermine confidence in the outcome" of the trial necessary to establish the prejudice prong of an ineffective assistance of counsel claim.

18cv0789-CAB (BGS)

*Strickland*, 466 U.S. at 694. He has not shown the trial court failed to make an adequate inquiry into his complaint or there was a conflict with his attorney so great it prevented the filing of a meaningful new trial motion. *Mendez-Sanchez*, 563 F.3d at 942.

Petitioner next contended at the *Marsden* hearing he belatedly recognized a juror as a customer at a store where Petitioner once worked as someone who may have harbored ill will toward him. As the appellate court noted, just prior to opening statements the prosecutor informed the court: "Over the weekend my investigator, Robert Dean, was listening to some calls that [Petitioner] made. And in the call [Petitioner] mentioned that he knew one of the jurors and that perhaps one of the jurors had been a customer of his at a Tool Mart, the retail outlet that [Petitioner] worked at." (ECF No. 25-6 at 7.) Trial counsel conferred with Petitioner off the record and then stated: "Your Honor, based on my knowledge and understanding, the person he is referring to was excused for cause. They're no longer on this jury and they are not empaneled on this jury." (*Id*. at 8-9.) When asked by the trial judge if that was correct Petitioner answered: "Yes, sir." (*Id*. at 9.) Seven months later, just prior to the *Marsden* hearing, trial counsel filed a posttrial motion for release of juror information in which she alleged a juror "failed to disclose his familiarity with [Petitioner] and that he had substantial contact with [Petitioner] through [Petitioner]'s employment over the course of at least three years." (ECF No. 25-33 at 102-14.) However, Petitioner did not identify the juror in any way or indicate he was a different juror than the one discussed prior to trial on direct appeal (ECF No. 25-35 at 40, 53), or in his federal Petition here (ECF No. 19 at 6). At the *Marsden* hearing defense counsel did say it was a different juror than the one at the beginning of trial, but she had located and interviewed the juror who denied knowing Petitioner, said he would have said something because he did not want to serve on the jury, and that she subpoenaed records from the business and they did not show they had any interaction with each other. (ECF No. 36 at 6, 12, 14-16.) The finding by the state appellate court that the trial judge made an adequate inquiry is objectively reasonable and there is no merit to Petitioner's contention he required substitute counsel in order to move for a new trial on this basis. *Mendez-Sanchez*, 563 F.3d at 942.

Petitioner next contended at his *Marsden* hearing the prosecutor inadvertently showed the jury an unredacted transcript of his police interview along with the corresponding audio where references were made to him having served time in prison, and although trial counsel objected she failed to ask the court to admonish the jury. The admission of that evidence is also the basis of claims two and eleven here where Petitioner argues the jury was called upon to decide whether he or Withers was the shooter, but he was portrayed as a tough guy who had been to prison whereas Withers' criminal history and prison record were not introduced. As discussed below in those claims, Petitioner has not established a federal constitutional violation by the admission of that evidence or in the manner it was handled by his counsel because it was fleeting, because strong evidence he was the shooter was presented, and because the jury also heard about Withers' criminal record and prison time. As quoted above, the state appellate court found trial counsel made a tactical decision to forgo requesting admonishment in order to avoid drawing further attention to evidence Petitioner had been in prison, recognized that scrutiny of counsel's performance "must be highly deferential," with a "strong presumption" that counsel's conduct fell within the wide range of professional assistance, and found Petitioner had not overcome his "heavy burden" in that respect. (ECF No. 25-38, *People v. Withers*, *et al*., No. D067156/D067470, slip op. at 55, citing *Strickland, supra*, 466 U.S. at p. 689.) As more fully developed in claims two and eleven below, that finding does not involve an objectively unreasonable application of clearly established federal law. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Yarborough*, 540 U.S. at 5 (recognizing a strong presumption that counsel took actions "for tactical reasons rather than through sheer neglect"), citing *Strickland*, 466 U.S. at 690 (holding that counsel is "strongly presumed" to make decisions in the exercise of professional judgment).

Petitioner next contended trial counsel did not object or seek an admonition when the prosecutor reenacted in an overly emotional manner during closing argument what the victim was doing and saying in the back seat of the car. At the Marsden hearing, he

specifically objected to the prosecutor screaming "Don't kill me. Don't kill me. Don't shoot me." (ECF No. 36 at 7.) The prosecutor argued in closing that the forensic evidence showed the victim was shot in the back of her right shoulder as she was turned toward the car door, either because she was turning away from the gun pointed at her or was trying to open the door and escape. (ECF No. 25-23 at 101-02.) Petitioner's trial counsel argued it was more natural to presume the victim put her arms up to protect herself when the driver pointed a gun at her, and the prosecutor argued in rebuttal:

> Yeah. That's possible. But let's think about this. If you're the female. You're in the backseat of the car. These two guys are driving. Your right front passenger is pointing a gun at you. Do you think Denise is going to go quietly into that goodnight? Or do you think she's going to go, No! No! Please no! That's what Denise was doing. She did not go quietly in to that goodnight. She did not turn and quietly put her arms up like that. She begged for her life. She begged to be - - whatever kind of mommy she could have been. We'll never know because these guys took away her opportunity to be that kind of a mom. But I promise you she did not go quietly. If she knew she was about to be murdered, absolutely the driver knew she was about to be murdered. There is no way that she turned and sat and did nothing. The position that she's seated in the backseat is not consistent with someone shielding themselves from the gun.

(ECF No. 25-24 at 69-70.) The prosecutor later argued the victim was "cowering in the corner screaming, please don't kill me!" (*Id*. at 87.)

As discussed below in claim nine where Petitioner claims the prosecutor committed misconduct in this respect and his trial counsel was deficient in failing to object, the prosecutor's argument was not objectionable because it asked the jury to draw a reasonable inference from the forensic evidence that the victim was either cowering in the corner of the backseat or attempting to open the door and escape when she was shot. "It is not misconduct for the prosecutor to argue reasonable inferences based on the record." *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom."); *Darden v. Wainwright*, 477

U.S. 168, 181 (1986) (holding that in determining whether prosecutorial misconduct rises to the level of constitutional error, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process.")

Even if the cold record does not reflect the scale of the emotional appeal Petitioner contends accompanied the prosecutor's argument, the jury was instructed that: "Nothing the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discussed and will discuss the case. But their remarks are not evidence. Their questions are not evidence." (ECF No. 25-23 at 36-37.) The finding by the state court that Petitioner had not overcome the presumption the jury followed that instruction is consistent with federal law. *See Boyde v. California*, 494 U.S. 370, 384 (1990) ("arguments of counsel generally carry less weight with a jury than do instructions from the court."); *Bruton v. United States*, 391 U.S. 123, 135 (1968) (holding that presumption jury follows their instructions can be rebutted if defendant shows "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.") The finding by the state appellate court that Petitioner failed to show he needed substitute counsel to file a new trial motion in this respect is objectively reasonable.

Petitioner next contended trial counsel failed to object to evidence regarding how quickly the victim died because it conflicted with a stipulation at the preliminary hearing that she died immediately when shot. The state court rejected this aspect of claim one on the basis that any objection would have been legally insufficient because the stipulation was limited to the preliminary hearing and not binding on trial counsel. As discussed below in claim ten, the prosecutor pointed out to the jury during her initial closing argument that Withers told Detective DuGal that the victim did not die right away, which the prosecutor used to argue in closing that the defendants did not attempt to save her life after they shot her, which she argued showed they planned to kill her all along. Petitioner's defense counsel argued that although the medical examiner did not testify whether the victim died immediately upon being shot, she testified that every one of the four shots were lethal, so

the jury could reasonably infer the victim died immediately upon being shot, and any action by Petitioner thereafter, including disposing of the body, had no relevance to the murder charge. (ECF No. 25-24 at 4-5, 38.) The prosecutor replied in rebuttal: "I didn't introduce the concept that she was alive and died later. Mr. Withers introduced that concept when he spoke to Detective DuGal. He's the one that said, when I got to the house, she was damn near gone." (ECF No. 25-24 at 72.) The prosecutor concluded: "The question isn't did she die immediately. The question is, what did you two do to try and save her life? Nothing. . . . And that tells you everything you need to know about their motive." (*Id*. at 74.) As discussed in claim ten, those comments were not objectionable because they asked the jury to draw a reasonable inference from evidence presented at trial. Petitioner has not shown the trial court failed to make an adequate inquiry or an inability to file a new trial motion. *Mendez-Sanchez*, 563 F.3d at 942.

Finally, Petitioner indicated he wished to raise claims in a new trial motion that his trial counsel did not communicate with him sufficiently to prepare him to testify and did not provide him with one of his prior statements until shortly before he was cross-examined so his testimony would not appear rehearsed. The trial judge elicited from trial counsel she had 24 years of experience at the office of the public defender, had conducted at least 100 criminal trials, and had discussed Petitioner's testimony with him prior to him testifying. (ECF No. 25-38, *People v. Withers*, *et al*., No. D067156/D067470, slip op. at 42.) The rejection by the state court on the basis he "failed to show a substantial impairment of his right to the assistance of counsel," and "failed to show the court abused its discretion or violated his due process right to a fair trial" (*id*. at 57), is objectively reasonable, as the trial court's inquiry adequately protected his due process rights. *See Rushen*, 686 F.2d at 829 ("The trial court must take the time to conduct such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern.")

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. "If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." Id. at 102. The Court finds the adjudication of claim one by the state court is neither contrary to, nor an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. Habeas relief is denied as to claim one.

## C.     Claim Two

Petitioner alleges in claim two that his Fourteenth Amendment right to due process was violated when the prosecutor inadvertently allowed the jury to hear he "had done hard-core prison time, including being in race-wars and riots." (ECF No. 19 at 7.) He argues the jury was called upon to decide who shot the victim and he was unfairly portrayed as more dangerous than Withers because the jury did not "hear of my co-defendant's other murder case where the victim was also similarly shot 4 times in the chest." (*Id.*)

Respondent answers this claim does not present a cognizable federal claim because it alleges only a state court evidentiary error. (ECF No. 24-1 at 44-45.) Respondent alternately argues that even if it presents a federal claim, the state court reasonably denied it on the basis that the instruction to the jury to disregard what they had heard about Petitioner's prison record prevented any prejudice. (*Id.* at 45-47.) Finally, Respondent contends that even if a federal error occurred, it is harmless. (*Id.*)

Petitioner presented this claim on direct appeal. (ECF No. 25-39 at 12-13; ECF No. 25-35 at 54-62). The appellate court stated:

> Next, McCreary claims the court's admission of "irrelevant and prejudicial evidence showing that (he) had been to prison denied (him) his right to a fundamentally fair trial, in violation of his right to due process of law." This claim is unavailing.
>
> 1. *Background*
>
> During the trial two brief references were made to McCreary's having been in prison. The first reference occurred early in the trial during

Gallentine's testimony about the incident at Withers's house when Rodriguez was screaming and yelling about having been raped and given bad dope. Specifically, Gallentine testified Rodriguez told McCreary he (McCreary) had given her the bad drugs and that McCreary reacted by telling Rodriguez, "Don't talk to me like that. I don't know what you're talking about." Gallentine also testified that McCreary told Rodriguez, "*I been to prison. I ain't no lame.*" (Italics added.)

Outside the presence of the jury during a break, McCreary's counsel, Kinchen, objected and asked the court to admonish the jury. The court granted Kinchen's request for an admonishment and told Gallentine, "Don't mention anything about either defendant('s) being in prison." Soon thereafter the court also admonished the jury: "There was an answer earlier by the witness in which he stated that Mr. McCreary said, 'I ain't no lame. I have been to prison.' The jury is ordered to disregard that portion of the answer and it is stricken from the record. Treat it as though you never heard it."

The second reference to McCreary's having been to prison occurred near the end of the trial during the prosecutor's cross-examination of McCreary. The prosecutor played for the jury an audiotape of Detective DuGal's lengthy interview of McCreary. The transcript of the police interrogation was marked as exhibit 131 and copies of the transcript were distributed to the jurors. While the audiotape played, the prosecutor projected the transcript for the jury to follow along.

At some point before the mid-morning recess was taken at 10:34 a.m., while the audiotape was playing and the transcript was being projected, the prosecutor interjected, "Okay. Your Honor, I need to fast-forward a short portion." She then stated, "You know what, Judge? One second. The recording isn't matching up with . . . the transcript. Just a moment, Your Honor. I'll make sure-" The prosecutor then said, "I think it's okay now." The playing of the audiotape resumed.

During the lunch recess, McCreary's counsel put on the record that "some parts of the transcript . . . talked about Mr. McCreary *being in prison or having been sentenced to prison and done prison time*. I think that those parts should be deleted from the final version (of the transcript) that goes to the jury. (¶) Obviously *we can't unring the bell now*. But any further part of the transcript and recording should be cleaned up for the jury to hear. I know that (the prosecutor) did try to get most of it and some of it apparently still seeped through about references to prison and serving prison time." (Italics added.)

The prosecutor responded by telling McCreary's counsel, "(T)he transcript you have is the original transcript. The one the jurors are watching, *there is one reference to (McCreary's) saying he was in prison*. That's been - it came up and I fast-forwarded through it. The rest of the transcript is clean." (Italics added.)

During the postverdict *Marsden* hearing (discussed, *ante*), McCreary's counsel told the court she did not ask the court to admonish the jury about the second reference to McCreary's having been in prison because "it was too late in the trial to do that."

### 2. *Standard of review*

A trial court's exercise of discretion in admitting or excluding evidence is reviewed on appeal for abuse of that discretion and will not be disturbed "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez, supra*, 20 Cal.4th at pp. 9-10.)

"The 'routine application of state evidentiary law does not implicate (a) defendant's constitutional rights.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.) A trial court's error under state law in the admission or exclusion of evidence following an exercise of discretion is properly reviewed for prejudice under *Watson*, *supra*, 46 Cal.2d at page 836. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Under the *Watson* harmless error test, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the (defendant) would have been reached in the absence of the error." (*Watson*, at p. 836.)

### 3. *Analysis*

McCreary's claims of evidentiary and constitutional error are based on his assertion that the jury improperly heard Gallentine's comment that McCreary had been in prison, and it saw a similar reference to his having been in prison in the projected police interview transcript it watched while the prosecutor played the audio recording of the interview. McCreary's claims are unavailing.

Assuming without deciding that the jury hearing Gallentine's comment and seeing the transcript reference to his having been in prison were prejudicial, we conclude any such prejudice was cured when, following Gallentine's comment, the court admonished the jury and ordered the

comment stricken from the record, making it clear to the jury that the reference to McCreary's having been in prison had nothing to do with the case. Specifically, the court told the jury, "There was an answer earlier by the witness in which he stated that Mr. McCreary said, 'I ain't no lame. I have been to prison.' The jury is ordered to disregard that portion of the answer and it is stricken from the record. Treat it as though you never heard it."

Even if we were to assume the court's admonishment did not cure any prejudice that resulted from the two references to McCreary's having been in prison, we conclude he has failed to demonstrate it is reasonably probable he would have obtained a more favorable result in the absence of the claimed evidentiary error. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) First, it is unlikely the jury would have found it shocking and would have been influenced by learning that McCreary had been in prison, given the evidence (discussed more fully, *ante*, in the factual background) showing that nearly everyone involved in the events that led up to Rodriguez's murder, including McCreary, used methamphetamine, that some had criminal records, and that some were in custody or had been in prison. (See *People v. Price* (1991) 1 Cal.4th 324, 433 (defendant convicted of murder failed to show prejudice under the *Watson* harmless error standard as a result of erroneous admission of irrelevant evidence that the prison gang to which defendant belonged was affiliated with organized crime; trial court found "the jury was unlikely to be shocked or influenced" by that evidence)). The jury heard evidence that Withers had been incarcerated and he was on parole when he was arrested. McCreary makes no attempt to explain how the jury learning he had been to prison would have caused the jury to be more likely to find that he, not Withers, shot and killed Rodriguez.

Second, the evidence of McCreary's guilt was very strong in that it showed he planned Rodriguez's murder and shot her, and he essentially admitted his culpability during the recorded phone call he received from Withers.

For the foregoing reasons, we conclude McCreary has failed to show the claimed evidentiary errors were prejudicial or violated his due process right to a fair trial.

(ECF No. 25-38, *People v. Withers*, *et al.*, No. D067156/D067470, slip op. at 57-61.)

The United States Supreme Court has held that an inquiry into whether evidence was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas

review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). As Respondent recognizes, however, a federal due process violation can arise from a state law evidentiary ruling that is arbitrary or capricious. *See Richmond v. Lewis*, 506 U.S. 40, 50 (1992) (holding that a state court's application of state law does not rise to the level of a federal due process violation unless it was so arbitrary or capricious as to constitute an independent due process violation). In addition, the Ninth Circuit has held that there are circumstances under which a federal habeas petitioner can establish a federal due process violation by showing the admission of evidence was so prejudicial it rendered the trial fundamentally unfair. *See Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."), citing *McGuire*, 502 U.S. at 67-69; *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.")

To the extent Petitioner contends the admission of the evidence of his prison record unfairly tempted the jury to find he committed the instant offence because he had a propensity to commit such offenses, the state court denial is consistent with clearly established federal law. The Ninth Circuit has held that because the Supreme Court in *McGuire* specifically reserved ruling on the issue regarding whether introduction of propensity evidence can give rise to a federal due process violation, and has denied certiorari at least four times on that issue since *McGuire* was decided, the right "has not been clearly established by the Supreme Court, as required by AEDPA." *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006). The Ninth Circuit has observed that even though a petitioner received a fundamentally unfair trial as a result of the introduction of prejudicially irrelevant evidence, a federal habeas court applying AEDPA could not grant the writ on that basis because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101

(9th Cir. 2009). The state court denial of this claim is not objectively unreasonable under 28 U.S.C. § 2254(d) because Petitioner has not identified any Supreme Court precedent finding a fundamentally unfair trial under those circumstances. *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (holding that the state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists).

Even if clearly established federal law recognizing fundamental unfairness as a due process violation could provide a basis for relief, no such unfairness is shown here. There is no merit to Petitioner's contention the jury heard he "had done hard-core prison time, including being in race-wars and riots." (ECF No. 19 at 7.) With respect to the second mention he was in prison, the transcript eventually given to the jury was redacted and did not contain that reference, and the audio they were exposed to was fleeting and it is not even clear the jurors saw or heard it. (ECF No. 25-18 at 35-36.) With respect to the first reference, Gallentine's brief testimony that Petitioner said: "I ain't no lame. I been to prison," the jury was instructed to ignore it, and this Court must presume the jurors followed that instruction. *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Petitioner can rebut that presumption if he can show "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135. In *Bruton* the presumption was rebutted because jury was instructed to ignore powerfully incriminating extrajudicial statements of a codefendant which were devastating to the defense and inherently unreliable, which was compounded by the failure of the codefendant to be subject to cross-examination. *Id.*

Petitioner attempts to rebut that presumption by arguing it was unfair the jury did not hear about Withers' prison record and criminal history and thus Petitioner was cast as the tough guy with a prison record in front of a jury called upon to determine which one of them shot the victim. However, as the state court noted, Withers admitted on direct examination he had felony convictions for auto theft, evading the police and sale of methamphetamine. (ECF No. 25-19 at 73.) On cross-examination he admitted he had

bragged about lying to the police during another murder investigation, said he "was a convict at the time," when asked if he was still a convict said: "I'm still a convicted felon, but at that point in time, I was actively involved in other criminal activity," and said that when the murder took place in this case he was awaiting sentencing for possession for sale of methamphetamine. (ECF No. 25-20 at 41-42.) The inadvertent mention of Petitioner's prison record was brief, whereas the evidence he was the shooter was strong, including Renteria's testimony Petitioner planned the shooting (ECF No. 24-13 at 132-33, 161-62), Gallentine's testimony Petitioner admitted he was the shooter (ECF No. 25-7 at 207). evidence Withers was driving and expert testimony the shots were fired by someone sitting in the front passenger seat (ECF No. 24-13 at 187, 191-92; ECF No. 25-15 at 28-29), and Jason Ming's testimony that Withers said there was a plan to kill the victim, that Withers was upset Petitioner shot her prematurely, and Withers wanted Petitioner to "man up" and take the blame for the shooting (ECF No. 25-15 at 70-72). Also, Petitioner was arrested in possession of the murder weapon, disposed of the body, and only stopped driving the car the murder took place in after Withers was arrested. In light of that evidence, and the fact that the jury heard details about Withers' prison record, convictions and criminal activity but only brief references to Petitioner having been in prison, he has not shown the brief references to his prison record rendered his trial fundamentally unfair.

The state court adjudication of claim two is neither contrary to, nor involved an unreasonable application of, clearly established federal law. *Richter*, 562 U.S. at 102; *Wright*, 552 U.S at 125-26; *Lockyer*, 538 U.S. at 75-76; *Williams*, 529 U.S. at 405-07; *Bruton*, 391 U.S. at 135; *Holley*, 568 F.3d at 1101; *Alberni*, 458 F.3d at 867. Nor is it based on an unreasonable determination of the facts, as Petitioner has not shown that the factual findings by the state court are objectively unreasonable. *Miller-El*, 537 U.S. at 340.

Finally, even if Petitioner could make such a showing, habeas relief is not available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The fleeting references to his having been in prison did not affect the jury's determination as to who shot the victim in

light of Withers' admission he was a convicted felon actively involved in criminal activity awaiting sentencing on a criminal conviction at the time of the murder, as well as the strong evidence Petitioner was the shooter. Habeas relief is denied as to claim two.

## D. Claim 3

Petitioner alleges his rights under the Sixth and Fourteenth Amendments were violated because the verdict form states the jury found he personally used a firearm but failed to contain a finding he intentionally discharged a firearm. (ECF No. 19 at 8.) He argues he was charged with and sentenced for personally using and intentionally discharging a firearm, and there was no finding of intentionality. (*Id*.)

Respondent answers this claim is procedurally defaulted based on the finding by the state court that Petitioner failed to contemporaneously object to the alleged error. (ECF No. 24-1 at 50-51.) Respondent alternately argues the state court reasonably found the jury was correctly instructed on the elements of the firearm enhancement and any defect in the verdict form did not reflect a different jury finding. (*Id*. at 51-52.)

Petitioner presented this claim to the state supreme court in his petition for review (ECF No. 25-39 at 13-16) which was summarily denied. (ECF No. 25-40.) It was also presented to the state appellate court on direct appeal (ECF No. 25-35 at 63-69) and denied on the merits. (ECF No. 25-38.) The Court will look through the silent denial by the state supreme court to the appellate court opinion on direct appeal, which states:

> McCreary also contends the 25-year-to-life firearm sentence enhancement imposed under section 12022.53(d) must be stricken because (1) the count 1 verdict form did not contain the language in that statute requiring a finding of an intentional discharge of a firearm, and thus (2) "(i)t cannot be determined beyond a reasonable doubt that each of the 12 jurors found that (he) intentionally discharged the firearm." We reject this contention.

> Section 12022.53(d) provides in part that "any person who, in the commission of a felony ( ), *personally and intentionally discharges a firearm* and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (Italics added.)

The count 1 verdict form returned by the jury states in part: "We, the jury in the above entitled cause, further find the defendant, JEFFREY McCREARY, "DID (¶) *(p)ersonally (u)se a firearm* to wit: 9mm Caliber semi-automatic firearm within the meaning of Penal Code section 12022.53(d)." (Italics added.)

McCreary's contentions are unavailing. First, as the Attorney General correctly argues, McCreary forfeited his claim by failing to object at trial. "An objection to jury verdict forms is generally deemed waived if not raised in the trial court." (*People v. Toro* (1989) 47 Cal.3d 966, 976, fn. 6, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.) A "defendant waive(s) any defect in the verdict forms by failing to object at trial." (*People v. Jones* (1997) 58 Cal.App.4th 693, 715, citing *People v. Toro*, *supra*, 47 Cal.3d at p. 976, fn. 6 & *People v. Lewis* (1983) 147 Cal.App.3d 1135, 1142.) Here, McCreary acknowledges "(i)t is true that (he) did not object to the verdict form."

Second, McCreary's claims fail on the merits. The information properly alleged in count 1 that McCreary "intentionally and personally discharged a firearm, to wit: a semi-automatic handgun, and proximately caused great bodily injury and death to a person (other than an accomplice), within the meaning of (section) 12022.53(d)." The court read the section 12022.53(d) enhancement allegation to the jury. The court later repeated the language in that allegation when it instructed the jury under CALCRIM No. 3149 that, if it found McCreary guilty of murder as charged in count 1, it must then decide whether the prosecution had proved beyond a reasonable doubt the additional allegation "that (McCreary) personally and *intentionally discharged a firearm* during that crime causing great bodily injury or death." (Italics added.) We presume the jury in this case understood and followed the instructions the court gave under CALCRIM No. 3149 (see *People v. Brady*, *supra*, 50 Cal.4th at p. 566, fn. 9), and there is nothing in the record to rebut this presumption. Accordingly, we conclude that notwithstanding the defect in the count 1 verdict form, the jury found that McCreary, in murdering Rodriguez, intentionally discharged a firearm within the meaning of section 12022.53(d).

(ECF No. 25-38, *People v. Withers*, *et al.*, No. D067156/D067470, slip op. at 62-63.)

### i) procedural default

Respondent first contends the claim is procedurally defaulted based on the finding by the state court Petitioner failed to contemporaneously object to the alleged error in the

18cv0789-CAB (BGS)

jury verdict form.  (ECF No. 24-1 at 50-51.)  When a state court rejects a federal claim for a violation of a state procedural rule which is adequate to support the judgment and independent of federal law, a claim is procedurally defaulted in federal court.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  A state procedural rule is "independent" if it is not interwoven with federal law.  *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001).  A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established" at the time of the default.  *Calderon v. United States District Court*, 96 F.3d 1126, 1129 (9th Cir. 1996).  The Court may reach the merits of a procedurally defaulted claim if the petitioner shows cause for the default and prejudice as a result, or if he demonstrates the failure to review the claim would result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.

Respondent has the initial burden of pleading the existence of an independent and adequate state procedural ground.  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  Respondent has satisfied that burden because the state court found this claim forfeited by Petitioner's failure to contemporaneously object.  *See id.* at 581 (holding that California's contemporaneous objection rule is "independent" of federal law); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999) (affirming denial of habeas relief on procedural default grounds based on California's contemporaneous objection rule).  The burden has shifted to Petitioner to show the procedural bar is not adequate and independent.  *Bennett*, 322 F.3d at 586.  Petitioner has made no such showing.[2]

The Court finds claim two is procedurally defaulted notwithstanding the decision by the state court to alternately reach the merits of the claim.  *See Harris v. Reed*, 489 U.S. 255 at 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim

---

[2]  Petitioner incorporates his appellate court briefs into his federal Petition with respect to claims one through seven.  (ECF No. 19 at 6-12.)  In state court he claimed the default could be excused based on ineffective assistance of counsel in failing to object (ECF No. 25-37 at 12-14) and refers to that brief in his Traverse.  (ECF No. 29 at 2.)  Even if that argument is properly raised here, it fails for the reasons set forth below in claim nine where he claims counsel was ineffective in failing to object to the verdict form.

in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.")

Petitioner may overcome the default by showing it was due to ineffective assistance of counsel, as he attempts to do in claim nine. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State."); *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) ("Although we have not identified with precision exactly what constitutes 'cause' to excuse a procedural default, we have acknowledged that in certain circumstances *counsel's ineffectiveness in failing properly to preserve the claim for review in state court* will suffice. Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.") (citation omitted) (emphasis added). He can also overcome the default by showing he is actually innocent as he attempts to do in claim fourteen. *See Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) (holding that a procedurally defaulted claim can be review on federal habeas where a petitioner establishes "it is more likely than not that no reasonable juror would have convicted him.")

As set forth below, claims nine and fourteen are without merit. Accordingly, Petitioner has not excused the default. Habeas relief is denied as to claim three on the basis it is procedurally defaulted.

### ii) merits

The claim also fails on the merits. The trial judge read the Information to the jurors at the beginning of trial, which charged Petitioner with "intentionally and personally discharge[ing] a firearm, to wit; a semi-automatic handgun, and proximately caused great bodily injury and death to a person (other than an accomplice), within the meaning of Penal Code section 12022.53(d)." (ECF No. 25-4 at 29.) The jury was later instructed:

> If you find the Defendant guilty of the crime charged in Count 1, which is first-degree murder, you must then decide whether for each crime the People have proved the additional allegation that the Defendant personally

and intentionally discharged a firearm during that crime causing great bodily injury or death. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.

In essence, this allegation asked who you believe that the People have proved beyond a reasonable doubt, who fired the weapon. All right? That's essentially what this personal use means.

To prove this allegation, the People must prove beyond a reasonable doubt that:

(1) the Defendant personally discharged a firearm during the commission of that crime;

(2) the Defendant intended to discharge the firearm; and

(3) the Defendant's act caused great bodily injury or the death of a person who was not an accomplice to that crime.

(ECF No. 25-23 at 71-72.)

The jury verdict read that Petitioner: "DID Personally Use a firearm to wit: 9mm Caliber semi-automatic firearm within the meaning of Penal Code section 12022.53(d)." (ECF No. 25-32 at 86.)

Thus, the jury was twice informed that California Penal Code § 12022.53(d) required intentional use of a firearm, and the verdict form specifically states they found California Penal Code § 12022.53(d) had been proven true beyond a reasonable doubt. The state court finding that Petitioner did not overcome the presumption the jury followed their instructions is consistent with clearly established federal law. *Francis*, 471 U.S. at 324 n.9 ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them.") Petitioner has not shown that the state court adjudication of this claim, on the basis he did not overcome that presumption, involves an unreasonable determination of the facts or is contrary to or involves an unreasonable application of clearly established federal law.

Habeas relief is denied as to claim three because it is procedurally defaulted and because the state court adjudication of the claim is objectively reasonable within the meaning of 28 U.S.C. § 2254(d).

**E.    Claim 4**

Petitioner alleges in claim four that his Fourteenth Amendment right to due process was violated by the refusal of the trial judge to dismiss his two strike priors because they occurred within hours of each other on a single day twenty-three years earlier and were adjudicated in the same proceeding. (ECF No. 19 at 9.) Respondent answers this claim is not cognizable on federal habeas because it presents an issue of state law only. (ECF No. 24-1 at 53-54.) Respondent alternately contends to the extent it raises a federal claim the decision not to strike the prior convictions was not so arbitrary and capricious as to violate federal due process because the trial judge carefully considered Petitioner's request before finding he fell within the spirit of the Three Strikes law. (*Id.* at 54-55.)

Petitioner presented this claim to the state supreme court in his petition for review (ECF No. 25-39 at 16-19) which was summarily denied. (ECF No. 25-40.) It was also presented to the state appellate court on direct appeal (ECF No. 25-35 at 70-76) and denied on the merits. (ECF No. 25-38.) The Court will look through the silent denial by the state supreme court to the appellate court opinion on direct appeal, which states:

> Last, McCreary contends the court abused its discretion in denying his *Romero* motion to strike his two 1989 robbery convictions, which were strikes for purposes of the Three Strikes Law. We reject this contention.
>
> 1. *Background*
>
> The court found to be true allegations in the information that McCreary had suffered two 1989 prior strike convictions within the meaning of the Three Strikes Law. The strikes involved two counts of robbery against two victims. McCreary was 19 years of age when he suffered those convictions in 1989.
>
> Before sentencing, McCreary filed his four-page *Romero* motion to strike his two prior strike convictions. McCreary argued that in the years following those convictions he "did not commit any new serious and or violent offenses," and he "struggled from addiction to controlled substances

48

throughout his adult life." He also argued the punishment he was facing under the Three Strikes Law was disproportionate to his criminal history, and he had "display(ed) remorse for his criminal conduct," "demonstrated an ability to conduct himself as a law abiding citizen for a significant period of time," and "demonstrate(d) a willingness and ability to rehabilitate himself."

At McCreary's sentencing hearing, the court denied McCreary's *Romero* motion, stating, "(G)iven the seriousness of the . . . strike priors and the seriousness of the case at hand, the Court denies the motion to strike the priors." The court then sentenced McCreary to an aggregate state prison term of 100 years to life, consisting of an indeterminate term of 25 years to life for his first degree murder conviction, which the court tripled to 75 years to life under the Three Strikes Law, plus a consecutive indeterminate term of 25 years to life for the firearm enhancement (§ 12022.53(d)).

2. *Applicable legal principles*

In *Romero, supra*, 13 Cal.4th at pages 504 and 529-530, the California Supreme Court held that section 1385, subdivision (a) permits a court acting on its own motion and "in furtherance of justice" to strike prior felony conviction allegations in cases brought under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). [Footnote: Section 1385, subdivision (a) provides in part that a trial court "may, either of (its) own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record. The court shall also set forth the reasons in an order entered upon the minutes."] Although the Legislature has not defined the phrase "in furtherance of justice" contained in that subdivision, the California Supreme Court has held that this language requires a court to consider both the "'"constitutional rights of the defendant, and the interests of society represented by the People"'" (italics omitted) in determining whether to strike a prior felony conviction allegation. (*Romero*, *supra*, 13 Cal.4th at p. 530.)

In *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*), the California Supreme Court explained that, in determining whether to strike or vacate a prior strike allegation or finding under the Three Strikes law "in furtherance of justice" pursuant to section 1385, subdivision (a), the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the (Three Strikes law's) spirit, in whole or in part, and hence

should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

In *People v. Carmony* (2004) 33 Cal.4th 367, 371 (*Carmony*), our high state court held that a trial court's decision not to dismiss a prior strike conviction allegation under section 1385, subdivision (a) is reviewed under the deferential abuse of discretion standard. (*Carmony*, at pp. 371, 376.) Carmony explained that "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id*. at p. 377.)

On appeal we review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien, supra*, 4 Cal.4th at p. 976.)

3. *Analysis*

Applying the deferential abuse of discretion standard, as we must (*Carmony, supra*, 33 Cal.4th at p. 371), we conclude McCreary has failed to meet his burden on appeal of showing that the court's denial of his *Romero* motion was an abuse of discretion and that he should be deemed to be outside the spirit of the Three Strikes law. The record shows the court considered the factors discussed in *Williams*: "(T)he nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects" (*Williams*, *supra*, 17 Cal.4th at p. 161).

As noted, McCreary claims his sentence is disproportionate to his criminal history because, during the years following his two 1989 robbery convictions, he "demonstrated an ability to conduct himself as a law abiding citizen for a significant period of time," and he had "demonstrate(d) a willingness and ability to rehabilitate himself." This claim is belied by his criminal history as detailed in the probation report, which shows that McCreary was convicted in 1992 of being a felon in possession of a firearm and possession of stolen property, for which he was sentenced to eight years in state prison. After he was released, he twice violated the terms of his parole and was returned to prison to finish his term. He was finally discharged from parole in 2004. Meanwhile, in 2003, he was convicted of possession of tear gas and sentenced to three years' court probation. In April 2009 he was convicted of possession of a switchblade knife and sentenced to three years' court probation, but his probation was revoked. Less than three years later, in early 2012 when he was 42 years of age, McCreary murdered Rodriguez.

The foregoing record of McCreary's criminal recidivism and the evidence establishing the willful and premeditated nature of his latest and most violent crime amply support the court's finding that he falls squarely within the spirit of the Three Strikes law. McCreary's claim that the court abused its broad discretion is meritless. Accordingly, we affirm the court's order denying McCreary's *Romero* motion.

(ECF No. 25-38, *People v. Withers*, *et al.*, No. D067156/D067470, slip op. at 63-67.)

As Respondent recognizes, a federal due process violation can arise from a state law ruling that is arbitrary or capricious. *Richmond*, 506 U.S. at 50 (holding that a state court's application of state law does not rise to the level of a federal due process violation unless it was so arbitrary or capricious as to constitute an independent due process violation); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (holding that a discretionary state sentencing statute created a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by the State). "Federal courts will not review a state supreme court's interpretation of its own statute unless that interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution." *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir. 1982).

In denying Petitioner's motion to strike, the trial judge stated:

> The Court notes and does take into consideration that the strikes did occur back in 1989, but those are quite serious offenses. And certainly the current case, involving the murder of a human being, is also quite serious.

> The Court read through the factual scenarios of those priors. They're, in fact, listed in the probation report on page 6, 7, and 8. And given the seriousness of the prior strike priors and the seriousness of the case at hand, the Court denies the motion to strike the priors.

(ECF No. 25-31 at 7.)

As the appellate court pointed out, the probation officer's report indicates that in addition to the two counts of armed robbery and assault with a firearm against two victims committed by Petitioner in 1989 when he was 19 years old and violated parole in 1992, he was convicted again in 1994 of being a felon in possession of a firearm and possession of

stolen property and sentenced to eight years in state prison.  (ECF No. 25-32 at 70-73.)  He violated the terms of his parole from that sentence twice.  (*Id*.)  He was sentenced to probation in 2003 after being convicted of possession of tear gas and again in 2009 after being convicted of possession of a switchblade knife.  (*Id*.)  Less than three years later he committed the instant murder.

The finding by the appellate court that the exercise of discretion by the trial judge to refuse to strike the prior convictions is supported by the record is objectively reasonable, as the trial judge considered the specific aspects of Petitioner's serious criminal history. Petitioner has not shown the state appellate court adjudication of this claim is contrary to, or an unreasonable application of, clearly established federal law providing that arbitrary and capricious factual findings or applications of state law can rise to the level of a federal due process violation, *Richmond*, 506 U.S. at 50; *Hicks*, 447 U.S. at 346, that it involves an unreasonable determination of the facts, *Miller-El*, 537 U.S. at 340, or that it "is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution."  *Knapp*, 667 F.2d at 1260.

Habeas relief is denied as to claim four.

**F.    Claim 5**

Petitioner alleges in claim five that his rights under the Sixth and Fourteenth Amendments were violated when the jury asked whether failing to help a victim who dies constitutes aiding and abetting murder but the trial judge merely referred them to their instructions rather than provide additional instruction.  (ECF No. 19 at 10.)  Respondent answers that this claim is not cognizable on federal habeas because it alleges an error of state law only, but even if it presents a federal claim the state court reasonably found no instructional error occurred in this respect, and alternately argues that any error is harmless. (ECF No. 24-1 at 55-59.)

Withers presented this claim to the state supreme court in his petition for review which was joined by Petitioner (ECF No. 25-39 at 17; ECF No. 25-54 at 21-31), and which was summarily denied.  (ECF No. 25-40.)  It was also presented to the state appellate court

on direct appeal by Withers and joined by Petitioner (ECF No. 25-35 at 77; ECF No. 25-53 at 42-69) and denied on the merits. (ECF No. 25-38.)

The Court will look through the silent denial by the state supreme court to the appellate court opinion on direct appeal, which states:

> Withers, joined by McCreary, contends the court breached its instructional duties when, in responding to a jury note during deliberations, it refused to tell the jury that aiding and abetting a murder cannot be predicated in and of itself on the failure to seek or render medical aid to a shooting victim (here, Rodriguez). We reject this contention.

> 1. *Background*

> a. CALCRIM Nos. 400, 401, 521 and 540A

> The court instructed the jury that Withers and McCreary were both charged in count 1 with first degree murder under two theories, each of which had different requirements: (1) willful, deliberate, and premeditated murder; and (2) felony murder. The court instructed the jury with CALCRIM No. 521 on the theory of willful, deliberate, and premeditated murder; and it instructed the jury with CALCRIM No. 540A on the theory of felony murder.

> Of particular importance here, the court also gave two instructions on aiding and abetting. First, it instructed the jury with a modified version of CALCRIM No. 400 on the general principles of aiding and abetting. Second, it gave CALCRIM No. 401, which explained the elements the prosecution was required to prove to establish that a defendant was guilty of a crime based on the theory of aiding and abetting, and which also informed the jury that "the fact that a person is present at the scene of a crime or *fails to prevent the crime* does not, *by itself*, make him an aider and abettor." (Italics added.) [Footnote: The court's instruction under CALCRIM No. 401 stated: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: (¶) ((1)) The perpetrator committed the crime; (¶) (2) The defendant knew that the perpetrator intended to commit the crime; (¶) (3) Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND (¶) (4) The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. (¶) Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. (¶) If all of these requirements are

proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. (¶) If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, *the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor.*" (Last italics added.)]

      b. *Jury's note with three questions and the court's response*

The jury started deliberating on June 10 in the afternoon. The following afternoon, the jury sent to the court a note with three questions, the first of which pertained to aiding and abetting and is at issue here:

"1) *If a person does not seek help for the victim of a criminal shooting and that victim dies, does that in and of itself constitute aiding and abetting the crime*?

"2) If the perpetrator of a crime points a gun at the victim who has consented to be in that place up to that point, and that victim reacts to the threat of the gun by turning to leave the . . . area, does that reaction by the victim establish kidnapping on the part of the perpetrator?

"3) Does the act of <u>deciding</u> to kill someone, whether under chaotic circumstances or non-chaotic circumstances, constitute premeditation?" (Italics added.)

Outside the presence of the jury, Withers's counsel requested that the court answer the jury's question about aiding and abetting as follows: "No, the law does not impose an affirmative duty to act."

After discussing with all counsel how it should respond to the jury's questions, the court sent a written response to the jury. The court's response first told the jury, "You must decide what the facts are, then follow the law as I explained it to you." Addressing the jury's aiding and abetting question, the court's response referred the jury back to the aiding and abetting instructions, stating, "Please see CALCRIMS 400 and 401."

/ / /

/ / /

### c. *Applicable legal principles*

### i. *Aiding and abetting liability*

A person incurs criminal liability as an aider and abettor when he or she (1) by act or advice, aids, promotes, encourages, or instigates the *commission* of a crime; (2) with knowledge of the perpetrator's unlawful purpose; and (3) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, italics added.)

### ii. *Duty to instruct on relevant principles of law*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) "The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and . . . necessary for the jury's understanding." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

### iii. *Section 1138*

A deliberating jury's request for information about a point of law that has arisen in the case triggers section 1138, which provides: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . ." [¶] Section 1138 imposes on the trial court a mandatory duty "to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another point as indicated in *In re Steele* (2004) 32 Cal.4th 682, 690.) However, the California Supreme Court has explained that "(t)his does not mean the court must always elaborate on the standard instructions. *Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information*." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*) (italics added.)

/ / /

iv. *Standard of review*

We generally review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) However, "(a)n appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

On appeal we review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien* (1993) 4 Cal.4th 929, 976, superseded by statute on other grounds.)

d. *Analysis*

As noted, the jury asked the court, "If a person does not seek help for the victim of a criminal shooting and that victim dies, does that in and of itself constitute aiding and abetting the crime?" Defendants claim the court prejudicially breached its instructional duties under section 1138 and violated their constitutional rights to due process and a fair trial in responding to the jurors' question by referring them back to the court's original aiding and abetting instructions.

We conclude the court did not abuse its discretion under section 1138, and it did not violate Withers's and McCreary's constitutional rights to due process and a fair trial when it responded to the jury's aiding and abetting question by directing the jury back to the court's original aiding and abetting instructions, CALCRIM Nos. 400 and 401. As already discussed, the California Supreme Court has explained that a trial court is not required to "always elaborate on the standard instructions," and, "(w)here the original instructions are themselves *full and complete*, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Beardslee, supra*, 53 Cal.3d at p. 97, italics added.)

Here, for purposes of section 1138, the court's original aiding and abetting instructions, CALCRIM Nos. 400 and 401, were full and complete. The jurors' question at issue here indicated they were confused about aider and abettor liability. Their third question - "Does the act of <u>deciding</u> to kill someone, whether under chaotic circumstances or non-chaotic circumstances, constitute premeditation?" - suggested they were either not fully attentive to the court's instructions or were having difficulty finding the relevant instructions in the substantial packet of instructions they had been given.

Thus, it was reasonable for the court to conclude it could clear up the jurors' confusion about aider and abettor liability by directing their attention to the relevant instructions on that issue, CALCRIM Nos. 400 and 401. Those instructions are correct statements of the law on aiding and abetting liability. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 (CALCRIM No. 400); *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1103-1104 (CALCRIM No. 401).) CALCRIM No. 401 properly answered the jury's aiding and abetting question by explaining that "(t)o prove that the defendant is guilty of a crime based on aiding and abetting that crime," the People were required to prove (among other things) that "*(b)efore or during the commission of the crime*, the defendant intended to aid and abet the perpetrator in committing the crime" (italics added). That instruction also explained that "(s)omeone *aids and abets* a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's *commission* of that crime." (CALCRIM No. 401, last italics added.) The foregoing instructions preclude a finding of aiding and abetting liability for mere after-the-fact actions (or inactions) following the commission of a crime. The requisite intent must be to "aid, facilitate, promote, encourage, or instigate the perpetrator's commission of (the) crime," and the defendant must have intended to aid and abet the perpetrator in committing the crime "*(b)efore or* during the commission of the crime" (italics added), *not after* the commission of the crime. (CALCRIM No. 401, italics added.) Thus, the original instructions properly informed the jury they could not find a defendant liable for aiding and abetting a crime based upon a defendant's act or failure to act *after* the commission of the crime.

The uncontested testimony by the prosecution's forensic pathologist, Dr. Schaber, established that the shooter, whom the jury found was McCreary, fatally wounded Rodriguez by firing three bullets through the back of her right shoulder, and the bullets went through her chest cavity, injuring both of her lungs and large blood vessels coming off of the heart, including the aorta and the pulmonary artery. One of the bullets also severed her spine. From the foregoing undisputed evidence and the nature of the fatal gunshot trauma, any rational jury could conclude Rodriguez did not survive for any appreciable amount of time after she was shot, and thus the murder was committed either at the moment Rodriguez was shot or within an inappreciable period of time thereafter. [Footnote: Dr. Schaber indicated that neither she nor her office was asked to determine when Rodriguez died.] Defendants have acknowledged Rodriguez did not survive for any appreciable amount of time after she was shot. Specifically, McCreary's counsel stated during her closing arguments at trial that "the evidence is unrefuted that (Rodriguez) died

instantly." On appeal, Withers acknowledges that "the record does not contain substantial evidence to support a theory Rodriguez was alive for any appreciable time after she was shot," and he concedes "there was certainly no evidence of any medical treatment that could have made a difference."

The court's original instruction under CALCRIM No. 401 properly answered the jurors' question about aiding and abetting liability based upon a failure to seek medical aid for a murdered shooting victim (here, Rodriguez) by informing them they could not find a defendant aided and abetted the murder based upon the defendant's conduct (such as the failure to seek medical aid for the victim) after the murder was committed. Thus, the court did not err in answering the jurors' question by referring them back to CALCRIM Nos. 400 and 401.

Furthermore, we presume the jury in this case understood and applied the instructions on aiding and abetting liability that the court gave under CALCRIM Nos. 400 and 401 (see *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9), and there is nothing in the record to rebut this presumption. On the contrary, the record shows that during the remainder of the jury's deliberations, it sent two more notes to the court but did not ask any additional questions about aiding and abetting liability.

(ECF No. 25-38, *People v. Withers*, *et al*., No. D067156/D067470, slip op. at 18-26.)

Clearly established federal law provides that in order to establish a federal due process violation by the failure to give a jury instruction, Petitioner must demonstrate that its omission "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977), quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Where the failure to give an instruction is in issue, the burden on the petitioner is "especially heavy." *Kibbe*, 431 U.S. at 155. Even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *California v. Roy*, 519 U.S. 2, 5 (1996).

The jury instructions clearly stated that aiding and abetting liability for murder must be predicated if at all on actions which took place prior to the killing. As discussed in detail below in claim ten, Detective DuGal testified Withers told him the victim was still alive

when they got to Withers' house, which the prosecutor used to argue it showed the defendants made no effort to assist the victim but left her in the car to die while they ate dinner. (ECF No. 24-23 at 101-04.) Petitioner's trial counsel pointed out in rebuttal that Petitioner and Withers both testified the victim died instantly upon being shot and the medical examiner gave no opinion on how long it took her to die. (ECF No. 25-24 at 4-5.) Petitioner's counsel argued that was important with respect to aiding and abetting liability because although Petitioner testified he assisted Withers in disposing of the body after the victim died, any actions taken after the victim died had nothing to do with the charge in this case, and argued Petitioner was innocent of murder because Withers pulled the trigger and Petitioner was unaware prior to that time of a plan to kill the victim. (*Id*. at 37-39.) Withers' attorney argued that a reasonable inference could be drawn the victim died instantly from being shot four times and disparaged the prosecutor for having raised the issue. (*Id*. at 66.) The prosecutor argued in rebuttal: "I didn't introduce the concept that she was alive and died later. Mr. Withers introduced that concept when he spoke to Detective DuGal. He's the one that said, when I got to the house, she was damn near gone." (*Id*. at 72.) The prosecutor argued this was relevant because neither defendant did anything to assist the victim after she was shot, and because they could not have known she died instantly their lack of action showed they intended the victim to die. (*Id*.) The prosecutor concluded: "The question isn't did she die immediately. The question is, what did you two do to try and save her life? Nothing. . . . And that tells you everything you need to know about their motive." (*Id*. at 74.)

Petitioner can rebut the presumption the jury followed their instruction that nothing which happened after the victim died was relevant to aiding and abetting if he can show "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135. He has made no such showing. Although the jury did not specify whether they found him guilty under an aiding and abetting or direct participant theory of first-degree murder, they found he was the

shooter. Forensic evidence showed the victim was shot four times at close range, severing her spine and an artery leading to her heart. (ECF No. 25-15 at 20.) The jury may have been considering whether Withers aided and abetted the murder by not helping the victim after she was shot, but there is no basis to find they were considering whether Petitioner's failure to help her after he shot her constituted him aiding and abetting the murder he committed. There is no indication the jury was unable to follow their instruction that nothing which happened after the victim died was material to guilt or innocence under an aiding and abetting theory, nor any indication the consequences from such an inability would have been vital to Petitioner's defense because the jury found he was the shooter. Petitioner has not carried his "especially heavy" burden of showing the omission of his requested instruction "so infected the entire trial that the resulting conviction violates due process." *Kibbe*, 431 U.S. at 154-55; *McGuire*, 502 U.S. at 62 (holding that an instructional error must render the trial unfair to support a due process claim).

Furthermore, any instructional error is harmless. The jury found Petitioner was the shooter, and strong evidence was introduced Petitioner intentionally fired the gun, including David Renteria's testimony Petitioner said he was going to "take care of it" and "Put that bitch in a corner" (ECF No. 24-13 at 132-33, 161-62), and Jason Ming's testimony that Withers said: "The bitch wasn't supposed to get shot in my backseat." (ECF No. 25-15 at 70.) Failing to instruct the jury that "the law does not impose an affirmative duty to act" in response to their question whether aiding and abetting liability can be predicated on a failure to provide aid to the dying victim, did not have a "substantial and injurious effect or influence in determining the jury's verdict" because evidence was presented Petitioner planned to kill the victim and shot her four times at point blank range. *Brecht*, 507 U.S. at 637; *Roy*, 519 U.S. at 5.

Habeas relief is denied as to claim five on the basis that the state court determination there was no instructional error is objectively reasonable within the meaning of 28 U.S.C. § 2254(d) and because any error is harmless.

/ / /

### G. Claim 6

Petitioner alleges in claim six there is insufficient evidence of kidnapping. (ECF No. 19 at 11.) Respondent answers that the state court reasonably found sufficient evidence of kidnapping was presented at trial. (ECF No. 24-1 at 59-62.)

Petitioner presented this claim on direct appeal (ECF No. 25-39 at 18; ECF No. 25-54 at 31-38; ECF No. 25-35 at 78; ECF No. 25-53 at 70-86.) The Court will look through the state supreme court order to the appellate court opinion on direct appeal, which states:

1. *Applicable legal principles*

a. *Kidnapping*

Section 207, subdivision (a) defines kidnapping and provides: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

"In order to establish a kidnapping under section 207, subdivision (a), the prosecution must prove '"(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance."'" (*People v. Arias* (2011) 193 Cal.App.4th 1428, 1434.)

b. *Section 1111.5 (corroboration requirement for testimony of in-custody informants, here Ming and Gallentine)*

Section 1111.5, subdivision (a), which requires corroboration of testimony given by in-custody informants, provides in part: "A jury . . . may not convict a defendant . . . based on the uncorroborated testimony of an in-custody informant. The testimony of an in-custody informant shall be corroborated by other evidence that *connects the defendant with the commission of the offense* . . . . Corroboration is not sufficient if it merely shows the commission of the offense . . . . Corroboration of an in-custody informant shall not be provided by the testimony of another in-custody informant unless the party calling the in-custody informant as a witness establishes by a preponderance of the evidence that the in-custody informant has not communicated with another in-custody informant on the subject of the testimony."

Subdivision (b) of section 1111.5 defines an "in-custody informant" as "a person, other than a codefendant, percipient witness, accomplice, or coconspirator, whose testimony is based on statements allegedly made by the defendant while both the defendant and the informant were held within a city or county jail, state penal institution, or correctional institution." Thus, to qualify as an in-custody informant within the meaning of section 1111.5, the informant must testify about a defendant's statements made while both the informant and defendant were incarcerated.

c. *Standard of review*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, "(c)onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury, supra*, 30 Cal.4th at p. 403.)

2. *Analysis*

As already noted, one of the theories upon which defendants were charged with the first degree murder was felony murder during the commission of a kidnapping. Defendants contend their first degree murder convictions must be reversed because there was insufficient evidence to establish that Rodriguez was unlawfully moved by the use of force or fear without her consent, and thus the evidence was insufficient to support a finding she was killed in Withers's Mercedes during the course of a kidnapping.

Viewing the evidence in the light most favorable to the judgment, as we must (*People v. Johnson, supra*, 26 Cal.3d at p. 578), we conclude the prosecution presented substantial evidence, predominantly circumstantial in nature, from which a reasonable trier of fact could find beyond a reasonable doubt that defendants unlawfully moved Rodriguez through the use of force or fear without her consent and, thus, that she was killed inside Withers's Mercedes during the course of a kidnapping. The evidence shows that before they put Rodriguez in the Mercedes at the Mount Vernon Inn, defendants, after they learned Rodriguez lied about being raped by Renteria, placed her under their control and told people at the Mount Vernon Inn to not allow Rodriguez to leave. Specifically, the prosecution presented evidence that on the night of January 31, a few hours before Rodriguez was shot, Withers drove McCreary and Rodriguez to the Mount Vernon Inn. Sometime after midnight on February 1, Withers and McCreary left the Mount Vernon Inn and Withers drove to the Del Dios apartment to confront Renteria about Rodriguez's claim that Renteria had raped her. Rodriguez remained at the Mount Vernon Inn with Rayborn, Monica, and Harris.

Griffith testified he was with Renteria at the Del Dios apartment, and he (Griffith) convinced Withers and McCreary that Renteria had not raped Rodriguez. Withers was angry that Rodriguez had lied to him about being raped. Renteria also testified he heard Withers call the Mount Vernon Inn and say either, "Put that bitch in a corner" or "Put that bitch on the phone." A few minutes later Withers and McCreary returned to the Mount Vernon Inn to get Rodriguez. Ming testified Withers told him that Withers grabbed Rodriguez by her arm and put her in his car. Gallentine testified Withers told him that Rodriguez was screaming and yelling and she tried to open the car door and get out before she was shot.

Substantial circumstantial evidence also shows that by the night of Rodriguez's murder, Withers and McCreary had formulated a plan to kill her. The prosecution presented evidence that at 6:50 p.m. on January 31, a few hours before Rodriguez was shot, McCreary texted Withers that he was negotiating to rent a "throw away." An investigator for the district attorney's office testified that the term "throw away" means an untraceable gun. Renteria's testimony shows that when he and Griffith met with Withers and McCreary that night, and after Withers finished calling someone at the Mount Vernon Inn and said either, "Put that bitch in a corner" or "Put that bitch on the phone," he (Renteria) heard McCreary say to Withers, "I got it" or "I'll take care of it."

As noted, defendants challenge the sufficiency of the evidence showing Rodriguez was killed during a kidnapping. Withers, joined by McCreary, asserts that (1) Ming's testimony that Withers told him Withers grabbed Rodriguez by her arm and put her in his car was "legally insufficient to show Rodriguez entered the (Mercedes) by force or fear without her consent" because this testimony was uncorroborated by independent evidence as required by section 1111.5, and (2) Gallentine's testimony did not corroborate Ming's statements. These assertions are unavailing.

As already discussed, section 1111.5 requires that testimony given by an in-custody informant (like Ming) "be corroborated by other evidence that *connects the defendant with the commission of the offense*." (§ 1111.5, subd. (a), italics added.)

We need not decide whether Ming's testimony - that Withers told him Withers grabbed Rodriguez by her arm and put her in his car - was corroborated by independent evidence as required by section 1111.5, because, even without Ming's testimony, a reasonable trier of fact could find beyond a reasonable doubt from the remaining substantial evidence discussed, *ante*, that (1) defendants unlawfully moved Rodriguez through the use of force or fear without her consent; and, thus, (2) she was killed inside Withers's car during the course of a kidnapping. We note that Gallentine's in-custody informant testimony - that Withers told him Rodriguez tried to open the car door and get out before she was shot - is sufficiently corroborated by the expert forensic testimony of Dr. Schaber. Dr. Schaber testified she determined during the re-creation of the shooting that in order for Rodriguez to be shot through the back of her right shoulder by someone in the front passenger seat, she had to be twisted to some degree in her upper body towards the car door. Dr. Schaber's testimony that it was possible Rodriguez was holding onto the door handle when she was turned towards the door and was shot is consistent with Gallentine's testimony that Withers told him Rodriguez tried to open the car door and get out before she was shot. We conclude Dr. Schaber's testimony independently corroborates Gallentine's testimony.

Withers also reasserts his claim that the jury improperly relied on a "legally insufficient" aiding and abetting theory that he aided and abetted McCreary's commission of the murder by "fail(ing) to render or seek medical aid for Rodriguez" after she was shot. We have rejected this claim for reasons discussed, *ante*.

(ECF No. 25-38, *People v. Withers*, *et al.*, No. D067156/D067470, slip op. at 26-32.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Petitioner is entitled to federal habeas corpus relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The standards of 28 U.S.C. § 2254(d) require an additional layer of deference in applying the *Jackson* standard, and this Court "must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005), quoting 28 U.S.C. § 2254(d)(1). Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," not as a means of error correction. *Richter*, 562 U.S. at 103, quoting *Jackson*, 443 U.S. at 332 n.5.

The record supports the state court finding that the jury was provided with sufficient evidence from which they could draw a reasonable inference Petitioner kidnapped the victim. Jason Ming testified Withers told him he grabbed the victim by the arm and forced her into the car. (ECF No. 25-15 at 76-77.) Jerry Gallentine testified Withers told him the victim was screaming and yelling and trying to get out of the car when she was shot (ECF No. 25-8 at 11, 13), which is consistent with the expert forensic evidence the victim was twisted toward the door when shot in the back of her right shoulder. (ECF No. 25-15 at 28-31.) Other evidence of kidnapping included evidence there was a plan to kill the victim, including Renteria's testimony Petitioner said he was going to "take care of it" and "Put that bitch in a corner" (ECF No. 24-13 at 132-33, 161-62) and Ming's testimony Withers said: "The bitch wasn't supposed to get shot in my backseat." (ECF No. 25-15 at 70.)

The jury could have drawn a reasonable inference from that evidence Petitioner planned to kill the victim, forced her into the car, held her at gunpoint and killed her when she attempted to escape. The Court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from

proven facts, by assuming the jury resolved all conflicts in a manner that supports the verdict. *Jackson*, 443 U.S. at 319. Even if Petitioner is correct that a reasonable inference could be drawn from the evidence that no kidnapping occurred, that does not satisfy his burden of showing the determination by the state court is unreasonable. *See Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (holding that *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"), quoting *Jackson*, 443 U.S. at 326; *Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("The jury in this case was convinced, and the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality.")

Accordingly, in light of the additional layer of deference this Court must give in applying the *Jackson* standard, as well as the Supreme Court's admonition that federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," *Richter*, 562 U.S. at 103, quoting *Jackson*, 443 U.S. at 332 n.5, the Court finds that the state court state court adjudication of claim six does not reflect "an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case." *Juan H.*, 408 F.3d at 1274. The Court also finds that the factual findings upon which the state court's adjudication of claim one rest are objectively reasonable. *Miller-El*, 537 U.S. at 340.

Habeas relief is denied as to claim six.

## H.    Claim 7

Petitioner alleges his Fourteenth Amendment right to due process was violated by the prosecutor's delay in notifying the defense of Jason Ming's existence as a witness and by his trial attorney's failure to request an instruction informing the jury of the delay. (ECF No. 19 at 12; ECF No. 25-54 at 39-44.) He argued in state court that Ming was the only witness to testify there was a plan to retaliate against the victim or whether the victim consented to go with them. (ECF No. 25-54 at 43-44.) Respondent answers that the state court reasonably found there was no discovery violation. (ECF No. 24-1 at 63-65.)

Petitioner presented this claim to the state supreme court in his petition for review (ECF No. 25-39 at 18; ECF No. 25-54 at 39-44) which was summarily denied. (ECF No. 25-40.) It was also presented to the state appellate court on direct appeal (ECF No. 25-35 at 78; ECF No. 25-53 at 87-93) and denied on the merits. (ECF No. 25-38.) The Court will look through the silent denial by the state supreme court to the appellate court opinion on direct appeal, which states:

> Last, Withers, joined by McCreary, contends the court prejudicially abused its discretion and violated their constitutional rights to due process and a fair trial by permitting prosecution witness Ming to testify "despite the prosecution's clear discovery violation and lack of diligence" in notifying Withers's and McCreary's counsel about the existence of this witness. In a related claim, Withers contends his trial counsel provided ineffective assistance in violation of his Sixth Amendment rights by failing to ask the court to instruct the jury with CALCRIM No. 306, which allows a jury to consider a party's failure to timely disclose evidence in violation of discovery rules when the jury evaluates the weight and significance of the evidence. We reject these contentions.

> 1. *Background*

> Trial proceedings in this case began on May 6, 2014. The next day, the court continued the trial to May 12, and the prosecution's first witness testified on that date. Sometime thereafter the prosecutor in this case, Jodi Breton, received information from another prosecutor in her office that, according to Ming's counsel, Ming might want to provide testimony in this case, but that prosecutor had no information about what Ming wanted to provide. Breton asked that Ming's counsel provide her with an offer of proof, but the information she received back was very vague.

> Late in the day on Thursday, May 22 of that year - during the People's case-in-chief - prosecutor Breton again learned, this time through Ming's counsel and her division chief, that Ming had information about this case, but she still did not receive any specifics about what that information was. [¶] That evening, the prosecutor contacted Ming's counsel in an effort to obtain more specifics about Ming's information. Again, Ming's counsel could not provide anything of substance about what information Ming had about this case. That same evening the prosecutor arranged with Ming's counsel for her to interview Ming the next day, May 23, which was the Friday before Memorial Day.

The next morning, Friday, May 23, the court was dark; and the prosecutor and Detective Troy DuGal of the San Diego County Sheriff's Department interviewed Ming with Ming's counsel present. Detective DuGal video recorded the interview, which ended at about 1:00 or 2:00 that afternoon. He had to return to his office to download the interview and make copies because he did not have the necessary equipment at the prosecutor's office, and this prevented the prosecutor from immediately providing a copy to defendants' counsel.

During the Friday interview the prosecutor determined that Ming had a tremendous amount of information about this case, including that he had been housed in a cell next to Withers's for two to three months and that Withers had spoken extensively to him about Rodriguez's murder. After the interview, either later that day or the next morning (Saturday, May 24), the prosecutor notified defendants' counsel she would be providing to them a recording of the interview. The prosecutor met with both counsel on Saturday and provided them with copies of the audio version of the recording of Ming's interview she had received from Detective DuGal earlier that morning.

Detective DuGal worked over the weekend and on the Memorial Day holiday (Monday, May 26) and prepared a report. The prosecutor gave Detective DuGal's report to defendants' counsel on Tuesday, May 27.

On Tuesday, May 27, 2014, over the objection of Withers's counsel [Footnote: McCreary's counsel did not object to the admission of Ming's testimony], and following a hearing during which the prosecutor presented the foregoing facts, the court granted the prosecutor's request to present Ming's testimony during the People's case-in-chief. Indicating that the trial originally had been set to begin in the fall of 2013 but it had been continued a couple of times because Withers had talked about this case to other people while in custody and against his counsel's advice, the court denied Withers's request for a two- or three-week continuance. Ming testified the next day.

2. *Applicable legal principles*

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or (known by) the prosecuting attorney . . . to be in the possession of the investigating agencies."'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280 (*Verdugo*).) "Evidence subject to disclosure includes . . . any '(r)elevant written or recorded statements of witnesses or reports of the statements of witnesses

whom the prosecutor intends to call at the trial, including any reports or statements of experts' ((§ 1054.1), subd. (f)) . . . ." (*Id*. at p. 280.) "'Absent good cause, such evidence must be disclosed at least 30 days before trial, or *immediately if discovered or obtained within 30 days of trial*. (§ 1054.7.)'" (*Ibid*., italics added.) [Footnote: Section 1054.7 provides in part: "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred."]

a. *Standard of review*

"(A)n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla, supra*, 22 Cal.4th at p. 723.) We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

"A violation of section 1054.1 is subject to the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836." (*Verdugo, supra*, 50 Cal.4th at p. 280.) Under the *Watson* standard, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the (defendant) would have been reached in the absence of the error." (*Watson*, p. 836.)

3. *Analysis*

Defendants' claim that the court prejudicially abused its discretion and violated their constitutional rights to due process and a fair trial by permitting Ming to testify is premised on their contention that the prosecutor violated her statutory discovery disclosure obligations under section 1054.7 by failing to diligently disclose to the defense in a timely manner that Ming would be a witness for the People at trial. This contention must be rejected because it is not supported by the record.

Under section 1054.7, absent good cause, mandated disclosures must be made by the prosecution at least 30 days before trial or "immediately" if the material and information becomes known to, or comes into the possession

of, the prosecutor within 30 days of trial.  (§ 1054.7; see *Verdugo, supra*, 50 Cal.4th at p. 280.)  Defendants cite no authority, and we are aware of none, that imposes on a prosecutor a duty to immediately interview any person who may want to testify in a case.

Here, as already discussed, the record shows that, within a few days after the first witness testified on May 12, 2014, the prosecutor became aware that Ming might want to testify in this case.  Defendants complain that "it was not until the prosecutor's supervisor got involved on May 22, 2014, that she took any real action," and the next day she was able to interview Ming and discover he had a tremendous amount of information about this case.

We conclude defendants have failed to meet their burden of demonstrating the prosecutor violated her statutory disclosure obligations under section 1054.1 and 1054.7.  The record shows that when the prosecutor initially learned that Ming might want to testify, she was diligently presenting her case-in-chief.  Notwithstanding this constraint, the prosecutor attempted unsuccessfully to learn the substance of whatever information Ming possessed.  She asked that Ming's counsel provide her with an offer of proof, but the little information she received back was very vague.  Later, in the morning on Friday, May 23, 2014 - when the court was not in session and the three-day Memorial Day weekend was about to begin - the prosecutor, taking advantage of the break in the trial, interviewed Ming with Detective DuGal to determine whether Ming had anything relevant or believable to say.  The very next morning, Saturday, May 24, 2014, the prosecutor met with defendants' counsel and provided them with copies of the audio version of the recording of Ming's interview she had received from Detective DuGal earlier that morning.  Detective DuGal worked over the weekend and on the Memorial Day holiday (Monday, May 26) and prepared a report.  The prosecutor gave Detective DuGal's report to defendants' counsel on Tuesday, May 27.

Jailhouse informants are notoriously unreliable.  Thus, the prosecutor's decision not to immediately interview Ming when she first learned Ming might want to testify, was reasonable.  The prosecutor did quickly ask Ming's attorney for additional information, and her decision to not spend valuable additional time during the presentation of her case-in-chief was understandable.  When the prosecutor learned Ming's information was relevant, she immediately arranged to provide the recording of Ming's interview and Detective DuGal's report to defendant' counsel.  Accordingly, we conclude defendants' discovery violation claim fails and the court did not abuse its discretion in denying Withers's request for a continuance.

We also conclude Withers's related claim of ineffective assistance of counsel fails. As noted, Withers contends his trial counsel provided ineffective assistance by failing to ask the court to instruct the jury with CALCRIM No. 306, which allows a jury to consider a party's failure to timely disclose evidence in violation of discovery rules when the jury evaluates the weight and significance of the evidence. This contention is unavailing.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To show prejudice, the defendant must show a reasonable probability a more favorable result would have been received had counsel's performance not been deficient. (*Strickland*, at p. 694; *Ledesma*, at pp. 217-218.)

Here, Withers's ineffective-assistance-of-counsel claim is premised on his assertion that the prosecutor violated her statutory disclosure obligations under section 1054.1 and 1054.7. For reasons discussed, *ante*, we have concluded the prosecutor did not violate those disclosure obligations. Accordingly, Withers's counsel had no duty to ask the court to instruct the jury with CALCRIM No. 306, and Withers's claim of ineffective assistance of counsel necessarily fails.

(ECF No. 25-38, *People v. Withers*, *et al*., No. D067156/D067470, slip op. at 32-39.)

Petitioner first contends his trial was rendered unfair by the late disclosure of discovery regarding Ming as a prosecution witness. "There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). To the extent Petitioner contends the prosecutor violated state law in failing to timely turn over the discovery, he has not stated a cognizable federal claim. *McGuire*, 502 U.S. at 67 ("[F]ederal habeas relief does not lie for error of state law.") Because the evidence at issue was disclosed to the defense during trial, Petitioner has not alleged a federal constitutional violation based on withholding evidence. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (noting that a prosecutor's federal constitutional duty to turn over discovery is implicated only where (1) the evidence is favorable to the defense because it is exculpatory

or impeaching, (2) it was suppressed by the state, either willfully or inadvertently, and (3) "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."), citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In addition, any federal error regarding the late disclosure of Ming's testimony is clearly harmless. The substance of Ming's testimony was disclosed to the defense on May 27, 2014, the day before the prosecutor rested her case-in-chief. (ECF No. 25-14 at 141-43; ECF No. 25-15 at 174.) Although Petitioner argues Ming's testimony was important, he has not identified how his defense was impacted by the late disclosure, such as being unable to find and present evidence to rebut Ming's testimony. In fact, his defense counsel indicated on the day of the disclosure she had already asked her investigators to begin working on acquiring Ming's jail records. (ECF No. 15-14 at 156-57.) Petitioner has not shown the late disclosure had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Petitioner also claims his trial counsel was deficient for failing to request the jury be instructed that a failure to follow state disclosure rules "may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial," as well as identifying the evidence which was not disclosed and stating: "In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure." (*See* ECF No. 25-53 at 90, referencing CALCRIM No. 306.) As set forth above, the state supreme court summarily denied this claim without a statement of reasoning, and the state appellate court addressed Withers' argument that his counsel was deficient in connection to the late disclosure but did not address Petitioner's ineffective assistance of counsel claim. This Court will conduct an independent review of the record in order to determine whether the silent denial by the state supreme court of Petitioner's claim is consistent with clearly established federal law. *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011). Under that standard, Petitioner bears the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must show that counsel's performance was deficient. *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Petitioner must also show that counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id.* at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. *Id.* at 687. "The standards created by Strickland and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Although Petitioner's trial counsel did not object to Ming's testimony (ECF No. 15-14 at 155), which implicated Withers far more than Petitioner, counsel indicated on the day of the disclosure she had already asked her investigators to begin working on acquiring Ming's jail records. (*Id.* at 156-57.) Withers' defense counsel objected to the admission of Ming's testimony, requested a continuance, and made a continuing motion for a mistrial based on the denial of his motion for a continuance, all of which were denied. (ECF No. 25-14 at 152-56; ECF No. 25-15 at 47.) To the extent Petitioner claims his counsel should have objected to the late disclosure, he has not explained how an objection made by his counsel would have been granted where the objections by his codefendant's counsel were denied. He claimed in state court his counsel should have requested the jury be instructed that the failure to follow state disclosure rules "may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial," identifying the evidence which was not disclosed, and stating: "In evaluating the weight

and significance of that evidence, you may consider the effect, if any, of that late disclosure." (*See* ECF No. 25-53 at 90, referencing CALCRIM No. 306.) He has not carried his "especially heavy" burden of showing that the omission of such an instruction "so infected the entire trial that the resulting conviction violates due process," *Kibbe*, 431 U.S. at 154-55, as he has not shown his defense was impacted by the late disclosure. For the same reason, he has failed to show counsel was deficient, nor established prejudice by showing a reasonable probability the result of the proceeding would have been different but for any error by his trial counsel in dealing with the disclosure of Ming's testimony.

The state appellate court finding that Petitioner failed to establish deficient performance or prejudice is neither contrary to, nor an unreasonable application of, *Strickland*, and is not based on an unreasonable determination of the facts. Habeas relief is denied as to claim seven.

## I. Claim 8

Petitioner alleges in claim eight that his rights under the Sixth and Fourteenth Amendments were violated by ineffective assistance of trial counsel in failing to contact and interview Roxanne Chavez prior to trial, who he contends could have testified the gun belonged to Withers and he was the shooter. (ECF No. 19 at 13.) Respondent answers that this claim is procedurally barred because the state habeas courts found it to be untimely. (ECF No. 24-1 at 65-69.) Respondent alternately argues that the denial of the claim by the appellate court on direct appeal, which addressed it as embedded in the *Marsden* claim, on the basis that counsel was not ineffective, is objectively reasonable. (*Id*. at 68-70.)

### i) procedural default

Petitioner raised this claim in his first series of habeas petitions filed in the state superior (ECF No. 25-41), appellate (ECF No. 25-43), and supreme courts (ECF No. 25-45). The superior and appellate courts found the petition was barred as untimely, and found this claim in particular barred because it had been raised and rejected on appeal as part of the *Marsden* claim and no interviewing change in law or facts were presented. (ECF No. 25-42, *In re McCreary*, No. NCN1500, order at 2-3; ECF No. 25-44, *In re McCreary*, No.

D073026, order at 2.)  The state supreme court denied the petition with an order stating: "The petition for writ of habeas corpus is denied on the merits.  (See *Harrington v. Richter* (2011) 562 U.S. 86, citing *Ylst v. Nunnemaker* (1991) 501 U.S. 797, 803.)"  (ECF No. 25-46, *In re McCreary*, No. S245567, order at 1.)

Although the state supreme court clearly denied this claim on the merits, it is unclear whether the citations to *Richter* and *Ylst* means it also adopted the procedural bar of untimeliness imposed by the appellate court as Respondent argues (ECF No. 24-1 at 66-67) or is an indication that any presumption it was doing so was rebutted.  The citation to page 803 of the *Ylst* opinion is a reference to the United States Supreme Court's determination that when a federal habeas court is faced with an unexplained denial by a state supreme court of a claim which has been previously addressed by a lower state court, the federal court presumes the state supreme court rested its decision on the reasoning of the lower courts.  *Ylst*, 501 U.S. at 803.  In addition, the *Richter* court in citing *Ylst* held: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication of state-law principles to the contrary," and that "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  *Id*. at 99-100, citing *Ylst*, 501 U.S. at 803.

Respondent does not persuasively argue the state supreme court adopted the lower court's finding of untimeliness.  If the California Supreme Court had not included the *Richter* and *Ylst* citations, this Court would have been obligated to read the order as being silent on the issue of timeliness.  *See Carey v. Saffold*, 536 U.S. 214, 226 (2008) (holding that an order of the California Supreme Court denying a habeas petition "on the merits and for lack of diligence" required an inquiry into whether the claim was timely under California law because "[g]iven the variety of reasons why the California Supreme Court may have included the words 'on the merits,' those words cannot by themselves indicate that the petition was timely."); *Evans v. Chavis*, 546 U.S. 189, 197 (2006) (holding that an order of the California Supreme Court denying a habeas petition which stated: "Petition

for writ of habeas corpus is DENIED" does not automatically indicate the petition was timely under state law because "if the appearance of the words 'on the merits' does not automatically warrant a holding that the filing was timely, the absence of those words could not automatically warrant a holding that the filing was timely."); *Ylst*, 501 U.S. at 802 (finding the Ninth Circuit erred in "applying a presumption that when a federal claim is denied without explicit reliance on state grounds, the merits of the federal claim are the basis for the judgment.")  The addition of the citations to *Richter* and *Ylst* here may be an indication the state supreme court was avoiding (or rebutting) any presumption it was adopting the appellate court's procedural bars.  Even if it could be construed in the opposite sense, the state appellate court observed claims eight through eleven had already been denied on the merits in connection to the *Marsden* claim, citing *In re Waltreus*, 62 Cal.2d 218, 225 (1965) for the proposition that claims eight through eleven were barred because they were raised and rejected on direct appeal, and such a citation does not support a procedural default in this Court.  *See Hill v. Roe*, 321 F.3d 787, 789 (9th Cir. 2003) (holding that *Waltreus* does not preclude federal habeas review), citing *Ylst*, 501 U.S. at 805.  Although an untimeliness bar could independently support a default notwithstanding the *Waltreus* bar if looking through that bar leads to a finding of untimeliness, *see Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir. 1996), looking through the *Waltreus* bar here leads to a decision on the merits of claims eight though eleven, at least to extent they were raised on direct appeal, in particular as part and parcel to the *Marsden* claim.  *See Maxwell v. Sumner*, 673 F.2d 1031, 1034-35 (9th Cir. 1982) (looking through *Waltreus* citation to a last reasoned state court judgment on the merits and finding no independent and adequate state procedural ground).  It would only be to the extent the factual basis for claims eight through eleven as presented here fundamentally alter the claims as they were presented and addressed on direct appeal in connection to the *Marsden* claim that they could be procedurally defaulted, and Respondent makes no effort to draw such a distinction.  *See Dickens v. Ryan*, 740 F.3d 1302, 1318-19 (9th Cir. 2014) (en banc) (holding that claim already addressed on the merits in state court can become procedurally defaulted "if new

factual allegations either 'fundamentally alter the legal claim already considered by the state court,' or 'place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it.'"), quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) and *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988).

It has been clearly established for many years that "if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, *and did not clearly and expressly rely on an independent and adequate state ground*, a federal court may address the petition." *Coleman*, 501 U.S. at 735 (emphasis added); *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court judgment in the case '*clearly and expressly*' states that its judgment rests on a state procedural bar.") (emphasis added). Because the state supreme court order denying claims eight through eleven cannot be described as clearly and expressly relying on a state procedural bar, the Court rejects Respondent's contention claims eight through eleven are procedurally defaulted.

### ii) merits

As set forth above, claims eight through eleven were raised on habeas in the state supreme court and denied "on the merits." When a state court denies a federal claim on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record.[3] *Stanley*, 633 F.3d at 860.

"Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir. 2003). Petitioner bears the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

---

[3] The Court need not "look through" to the state appellate court opinion on direct appeal with respect to any aspects of claims eight though eleven addressed in the *Marsden* claim because the Court has already denied those aspects of the claims.

Petitioner alleges he received ineffective assistance of trial counsel in failing to contact and interview Roxanne Chavez prior to trial, whom he contends could have testified the gun belonged to Withers and he was the shooter. (ECF No. 19 at 13.) As set forth above in claim one, Petitioner attached to his state habeas petition an interview report with Roxanne Chavez by a defense investigator dated about seven months after the verdicts were received. Chavez told the investigator Penman had asked her where Petitioner kept his gun, and she "responded initially by saying something to the effect of, 'why would I tell you that?'" (ECF No. 25-41 at 28.) She then told Penman "that if it was in the car they would see it because [Petitioner] did not try to hide it," and said that she "believed that Withers was looking in the center console for the gun." (*Id*.) Although Chavez may have been able to testify that Withers was looking for the gun, from which counsel may have argued it was in Withers' possession, Chavez's statement indicates the gun belonged to Petitioner, something his trial counsel had been successful in preventing the jury from hearing. Ming testified at trial that Withers admitted he was "the one who got the gun." (ECF No. 25-15 at 78.) Ming then testified he thought the gun belonged to Petitioner which drew an objection from his trial counsel, which was sustained and the jury told to disregard that statement. (*Id*.) Petitioner testified the gun did not belong to him and he told the police it belonged to Withers. (ECF No. 25-16 at 175-201; ECF No. 25-32 at 287.) Petitioner admitted at the *Marsden* hearing that his trial counsel was aware of Chavez prior to trial, and in fact the prosecutor asked Renteria and Penman in passing during their trial testimony relatively early in the prosecution's case-in-chief if they knew Chavez. (ECF No. 25-10 at 231; ECF No. 25-13 at 83-84.) Petitioner has not made a clear record that his trial counsel did not know of or investigate Chavez prior to trial. Rather, he states Chavez came forward with information after trial, which is what may have precipitated her interview with a defense investigator after the verdicts were announced.

However, even assuming Petitioner told trial counsel about Chavez prior to trial but counsel did not contact her until after trial, Petitioner has not shown *Strickland* prejudice. Petitioner states he was having an affair with Chavez and they had a child together,

indicating she may have been biased in his favor. (ECF No. 19 at 36.) Petitioner denied owning the murder weapon and his trial counsel prevented the jury from hearing the gun belonged to him, so it was reasonable for counsel to prevent Chavez from so testifying. In light of the fact that avoiding Chavez's testimony the gun belonged to Petitioner was favorable to the defense and calling her to testify she "believed" Withers was looking for Petitioner's gun was cumulative to Ming's testimony that Withers said he was looking for the gun, Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" of the trial sufficient to establish prejudice arising from the failure to call Chavez as a witness. *See Strickland*, 466 U.S. at 694 (holding that prejudice requires showing "a probability sufficient to undermine confidence in the outcome."); *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so.") (citations omitted).

The Court finds, based on an independent review of the record, it was objectively reasonable for the state court to reject Petitioner's claim that his defense counsel rendered constitutionally ineffective assistance in failing to call Chavez as a trial witness. *Richter*, 562 U.S. at 105; *Strickland*, 466 U.S. at 694; *see also Pinholster*, 563 U.S. at 181 (holding that the standards of *Strickland* and 28 U.S.C. § 2254(d) are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt.")

Habeas relief is denied as to claim eight.

## J.    Claim 9

Petitioner alleges in claim nine that his rights under the Sixth and Fourteenth Amendments were violated "by the prosecutor's cumulative misconduct and multiple trial errors," and by his trial counsel's failure to object to that misconduct and request the jury be admonished. (ECF No. 19 at 14.) He alleges the prosecutor argued: (1) the judge was biased against him, (2) she was bringing truth to the jury, (3) defense counsel lied to the jury about when the victim died, (4) that Petitioner lied during his testimony without any factual basis for doing so, and (5) the victim begged to be a mother before being shot when the evidence showed she was shot without warning. (*Id*. at 14, 41-42.) Respondent

answers that this claim is procedurally barred because the state appellate court on habeas found it to be untimely and the state supreme court on habeas adopted that finding. (ECF No. 24-1 at 70-71.) Respondent alternately argues the state court denial of the claim is objectively reasonable because there was no prosecutorial misconduct. (*Id.* at 71-73.)

For the reasons set forth above in claim eight, the Court find this claim is not procedurally defaulted and will conduct an independent review of the record to determine whether the denial by the state supreme court "on the merits" is objectively reasonable.

For prosecutorial misconduct to rise to the level of federal constitutional error, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. "It is not misconduct for the prosecutor to argue reasonable inferences based on the record." *Younger*, 398 F.3d at 1190; *see also Ceja*, 97 F.3d at 1253-54 ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom.")

Petitioner first contends the prosecutor argued the trial judge was biased against him. Withers' counsel argued in closing that the deals the prosecutor gave Ming and Gallentine to testify were corrupt, and in rebuttal the prosecutor argued that in order to believe that, the jury would "also have to believe that this judge is corrupt, in on it, slimy, a dirt bag, that he's going to let these two men escape justice." (ECF No. 25-24 at 80.) There is no merit to a claim this constituted an argument the trial judge was biased against Petitioner.

Petitioner next contends the prosecutor argued she was bringing truth to the jury. Withers' defense counsel, in response to the prosecutor's argument that the government had to deal with otherwise unreliable in-custody witnesses like Ming and Gallentine for the greater good, argued it was similar to providing asylum to Nazis because they might otherwise work for the Communists or interring Japanese-Americans in camps because they might conduct sabotage. (ECF No. 25-24 at 59-62.) In rebuttal, the prosecutor said:

> And if you'll notice, [Withers' counsel] spent very little time actually talking about the facts of this case. He spent a lot of time with eloquent words eloquent phrases, calling me -- comparing me, basically, to Nazis, Nazi

Germany. Comparing me to people that did the Japanese internment camps, that I'm the government. I'm this big, bad entity that's coming down upon poor Mr. Withers. [¶] She's the government. He's the government. He's the government. The bailiffs are the government. [¶] I'm not a Nazi. I don't have anything to do with any of those activities. But I am a prosecutor and I am here bringing, really, the truth to you folks. Not because of the massive government oppression, but because someone was killed senselessly and murdered and she deserves justice.

(ECF No. 25-24 at 69.)

A prosecutor may commit misconduct by personally vouching for the credibility of a witness or hint there is some evidence the jury does not know about. *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) ("Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony.") The prosecutor did not commit misconduct because her argument she was bringing truth to the jury was in rebuttal to defense counsel's argument the government was overpowering his client's ability to defend himself or was in the business of oppressing people like him. Viewed in context, it is not an attempt to subvert the jury's role as the factfinder though a personal assurance of the truth of the prosecution's case or the facts presented. *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.") In light of the jury's instruction that the comments of counsel is not evidence, it did not inject unfairness into the trial. *See Boyde*, 494 U.S. at 384 ("arguments of counsel generally carry less weight with a jury than do instructions from the court.")

Petitioner contends the prosecutor improperly argued that his defense counsel had lied to the jury about when the victim died when the prosecutor stated: "[Petitioner's defense counsel] said that the medical examiner could have told you, like, pinpointed the minute of the death. No, she couldn't. That's -- maybe on, like, "Law and Order" or TV

shows they might be able to do it. But not in real life. They can't do that. And if that was a question that was something that [Petitioner's defense counsel] wanted to know, she could have asked the medical examiner." (ECF No. 25-24 at 74.) The very first question Petitioner's trial counsel asked the medical examiner was if there was an official time of death, to which the examiner answered that twelve hours had passed since the victim was found by law enforcement, the victim was pronounced dead before her office was called, there were too many variables to be exact, and her office was never asked to make that determination. (ECF No. 25-15 at 33-34.) The prosecutor's statement was correct, is supported by the trial record, and was made in rebuttal to defense counsel's argument the prosecution failed to present available evidence of the time of death. The statement is not an indication the prosecutor knew, based on information not presented to the jury, that the medical examiner could not have made such a determination, nor an accusation defense counsel lied about when the victim died. In any case, the jury was instructed that argument of counsel is not evidence, and Petitioner has not rebutted the presumption they followed that instruction. *See Boyde*, 494 U.S. at 384 ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.")

Petitioner next contends the prosecutor accused him of lying during his testimony but without stating why. The prosecutor stated: "Now, the evidence absolutely suggests that [Petitioner] is the one that did the shooting. I know what his explanation is. I think it's a difficult sell to try and say that - that - what he's saying is that he's denying. And [Petitioner], the majority of his testimony, was, frankly, unbelievable." (ECF No. 25-24 at 73.) It was not misconduct for the prosecutor to make such a mild challenge to Petitioner's credibility. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is whether such conduct infected the trial with unfairness.") Nor has he overcome the presumption the jury followed their instruction that argument of counsel is not evidence. *Boyde*, 494 U.S. at 384.

Petitioner next contends the prosecutor told the jury the victim begged to be a mother before being shot, which he argues was improper because the evidence showed she was

shot without warning. As discussed in claim one, the prosecutor argued in rebuttal, when addressing an argument made by Petitioner's trial counsel that it was natural to presume the victim put her arms up to protect herself when the driver pointed a gun at her, that:

> Yeah. That's possible. But let's think about this. If you're the female. You're in the backseat of the car. These two guys are driving. Your right front passenger is pointing a gun at you. Do you think Denise is going to go quietly into that goodnight? Or do you think she's going to go, No! No! Please no! That's what Denise was doing. She did not go quietly in to that goodnight. She did not turn and quietly put her arms up like that. She begged for her life. She begged to be - - whatever kind of mommy she could have been. We'll never know because these guys took away her opportunity to be that kind of a mom. But I promise you she did not go quietly. If she knew she was about to be murdered, absolutely the driver knew she was about to be murdered. There is no way that she turned and sat and did nothing. The position that she's seated in the backseat is not consistent with someone shielding themselves from the gun.

(ECF No. 25-24 at 69-70.)

The prosecutor asked the jury to draw an inference regarding what the victim may have been experiencing in the back seat of the car based on evidence presented at trial that she had been kidnapped, placed in the back seat of the car, and was turning away either cowering or trying to escape while Petitioner shot her four times. It is not unreasonable to infer the victim was terrified and begging for her life. *Younger*, 398 F.3d at 1190 ("It is not misconduct for the prosecutor to argue reasonable inferences based on the record."); *Ceja*, 97 F.3d at 1253-54 ("Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom.") In addition, evidence was presented at trial that the victim took her child with her while she was consuming drugs and associating with drug users. The prosecutor's comments that it did not matter what type of mother she was or would have been had she lived was based on that evidence and was not misconduct. As the prosecutor's comments were not objectionable, Petitioner has not established ineffective assistance of counsel from his trial counsel's failure to object or request admonishments.

Based on an independent review of the record, the state court adjudication of this claim is not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Habeas relief is denied at to claim nine.

## K.    Claim 10

Petitioner alleges in claim ten that his rights under the Sixth and Fourteenth Amendments were violated by the prosecutor's knowing use of false testimony regarding the manner of the victim's death and by trial counsel's failure to object and request a mistrial. (ECF No. 19 at 15.) Respondent answers that this claim is procedurally barred because the state habeas courts barred it as untimely and for failure to raise it on direct appeal. (ECF No. 24-1 at 73-74.) Respondent alternately argues that the denial of the claim by the state supreme court on the merits on state habeas is objectively reasonable because the prosecutor did not present any false evidence. (*Id*. at 74-76.)

For the reasons set forth above in claim eight, the Court find this claim is not procedurally defaulted and will conduct an independent review of the record to determine whether the denial by the state supreme court "on the merits" is objectively reasonable.

Clearly established federal law provides that a prosecutor has a constitutional duty to correct knowingly false testimony. *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) (holding that due process is violated if the prosecution knowingly presents false evidence or fails to correct any falsity of which it is aware). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Petitioner has failed to identify specifically what evidence he contends was false. It appears he relies on the preliminary hearing stipulation that the victim died instantly upon being shot and on his own and Withers' testimony to that effect to contend the prosecutor violated that stipulation during closing argument when she told the jury they could draw a reasonable inference that the victim did not die immediately. The prosecutor argued that a reasonable inference to be drawn from the ballistics evidence that the victim was shot in

the back of her right shoulder was that the victim was opening the door attempting to jump out when she was shot and thus shot while trying to escape. (ECF No. 24-23 at 101-02.) She pointed out that Withers told Detective DuGal the victim was still alive when they got to Withers' house, and argued it showed the defendants made no effort to assist the victim but left her in the car dead or dying while they ate dinner. (*Id*. at 101-04.)

Petitioner's trial counsel began her closing argument by asking the jury to "look at the time of Denise's death." (ECF No. 25-24 at 4.) She argued that Petitioner and Withers both testified the victim died instantly upon being shot and the medical examiner gave no opinion on how long it took her to die. (*Id*. at 4-5.) She argued the time of death was important with respect to aiding and abetting liability because although Petitioner testified that he assisted Withers by disposing of the body after the victim died, those actions had nothing to do with the charges in this case, and Petitioner was innocent of murder because Withers pulled the trigger and Petitioner was unaware prior to that time of a plan to kill the victim. (*Id*. at 37-39.) Withers' attorney argued that a reasonable inference from being shot four times is that the victim died instantly. (*Id*. at 66.) The prosecutor stated in rebuttal: "I didn't introduce the concept that she was alive and died later. Mr. Withers introduced that concept when he spoke to Detective DuGal. He's the one that said, when I got to the house, she was damn near gone." (*Id*. at 72.) She argued it was relevant because both defendants claimed to be the driver but neither one did anything to assist the victim after she was shot, and because they could not have known she died instantly, their lack of action showed they intended the victim to die. (*Id*.) She stated: "The question isn't did she die immediately. The question is, what did you two do to try and save her life? Nothing. . . . And that tells you everything you need to know about their motive." (*Id*. at 74.)

Petitioner has failed to show the prosecutor knowingly used false evidence to argue the victim did not die immediately upon being shot. Rather, she argued it was a reasonable inference to be drawn from the trial testimony of Detective DuGal. Because there was no basis for an objection or a mistrial, Petitioner has not shown his counsel was deficient. Nor

has he established prejudice because he has not shown "a probability sufficient to undermine confidence in the outcome" of the trial arising from the failure to object. *See Strickland*, 466 U.S. at 694 (holding that prejudice requires showing "a probability sufficient to undermine confidence in the outcome."); *Pinholster*, 563 U.S. at 181 (holding that the standards of *Strickland* and 28 U.S.C. § 2254(d) are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt.")

Habeas relief is denied as to claim ten.

## L.    Claim 11

Petitioner alleges in claim eleven that his rights under the Sixth and Fourteenth Amendments "were violated when the jury heard improper illegal prejudicial evidence of serious prior prison terms," and by his trial counsel's failure to object or request a mistrial. (ECF No. 19 at 16.)  Respondent answers that this claim is procedurally defaulted because the state habeas courts barred it as untimely and for failure to raise it on direct appeal.  (ECF No. 24-1 at 76.)  Respondent alternately argues that the denial of the claim by the state appellate court as a claim subsumed into the *Marsden* claim is objectively reasonable.  (*Id.* at 76-77.)

For the reasons set forth above in claim eight, the Court find this claim is not procedurally defaulted and will conduct an independent review of the record to determine whether the denial by the state supreme court "on the merits" is objectively reasonable.

As set forth above, the United States Supreme Court has held that an inquiry into whether evidence was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas review of a state conviction." *McGuire*, 502 U.S. at 67.  Petitioner can only establish a federal due process violation by showing the admission of the evidence was so prejudicial it rendered his trial fundamentally unfair.  *See Johnson*, 63 F.3d at 930, citing *McGuire*, 502 U.S. at 67-69; *see also Jammal*, 926 F.2d at 919-20 ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.")

/ / /

As discussed above in claims one and two, Withers admitted on direct examination he had felony convictions for sale of methamphetamine, auto theft and evading the police. (ECF No. 25-19 at 73.) On cross-examination he admitted he is a convicted felon and was awaiting sentencing on a conviction for possession for sale of methamphetamine when the murder took place in this case. (ECF No. 25-20 at 41-42.) The first mention by Gallentine that Petitioner had been in prison was cured by an admonishment to the jury to disregard it. The second mention of Petitioner's prison record was inadvertent, fleeting, and perhaps not even noticed by the jury, and trial counsel made a reasonable tactical decision not to object or request an admonition in order to avoid drawing the jury's attention to it. In addition, the evidence Petitioner was the shooter was strong, including Renteria's testimony Petitioner planned the shooting (ECF No. 24-13 at 132-33, 161-62), Gallentine's testimony Petitioner admitted he was the shooter (ECF No. 25-7 at 207), evidence Withers was driving and expert testimony the shots were fired by someone sitting in the front passenger seat (*id*. at 187, 191-92; ECF No. 25-15 at 28-29), Petitioner disposing of the body himself, retaining possession of the murder weapon and continuing to drive the car the murder took place in until Withers was arrested, and Jason Ming's testimony that Withers said there was a plan to kill the victim, that Withers was upset Petitioner shot her prematurely, and Withers wanted Petitioner to "man up" and take the blame for the shooting (ECF No. 25-15 at 70-72). In light of the fact that the jury knew Withers had also been in prison and heard details about his convictions and criminal history, and in light of the strong evidence of Petitioner's guilt, he has not shown the brief references to the fact that he had been in prison rendered his trial fundamentally unfair.

Petitioner contends trial counsel was deficient in failing to object and request a jury admonition. His trial counsel did object and request an admonition after the first time his prison record was mentioned by Gallentine. Counsel indicated at the *Marsden* hearing that she decided not to do so the second time where it was not even clear any or all the jurors noticed the reference he made to being in prison during his police interview because she made a tactical decision not to call the jury's attention to the inadvertent mention of his

prison record. Based on an independent review of the record, Petitioner has not overcome the "strong presumption" that his trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Neither has he shown "a probability sufficient to undermine confidence in the outcome" of the trial arising from the failure to object or request a mistrial. *See Strickland*, 466 U.S. at 694 (holding that prejudice requires showing "a probability sufficient to undermine confidence in the outcome."); *Pinholster*, 563 U.S. at 181 (holding that the standards of *Strickland* and 28 U.S.C. § 2254(d) are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt.")

Habeas relief is denied as to claim eleven.

## M.   Claim 12

Petitioner alleges in claim twelve that his rights under the Sixth and Fourteenth Amendments were violated by ineffective assistance of counsel when his trial attorney failed to discuss the legal significance of the probation presentence report with him, and by failing to investigate, prepare or present mitigating evidence at his sentencing hearing. (ECF No. 19 at 17.) He argues counsel should have informed the trial judge that he was once diagnosed with methamphetamine psychosis, had once pleaded not guilty by reason of insanity, and that his son died of cancer. (*Id*.)

Respondent answers that this claim is procedurally defaulted because the state habeas courts barred it as untimely. (ECF No. 24-1 at 78.) Respondent alternately argues that the denial of the claim by the state appellate court, on the basis Petitioner had identified no mitigating evidence counsel should have presented or explain how he would have obtained a lower sentence, is objectively reasonable. (*Id*. at 78-79.)

### i)  procedural default

Petitioner raised this claim in the state habeas courts in same manner as claims eight through eleven, and like those claims it was denied by the state supreme court "on the merits" with citations to *Richter* and *Ylst*. (ECF No. 25-41-25-46.) Unlike claims eight through eleven, however, the state appellate court recognized this claim had not been

presented on direct appeal, and denied it as untimely and for failing to state a prima facie case for relief, finding Petitioner had identified no mitigating evidence counsel should have presented and did not explain how he would have obtained a lesser sentence. (ECF No. 25-44, *In re McCreary*, No. D073026, order at 2.)

As set forth above in claim eight, the state supreme court order is ambiguous as to whether it was denying this claim on the merits only or also adopting the appellate court's procedural bars. Unlike claims eight though eleven, however, this claim was not presented on direct appeal, and the denial of this claim on the merits by the state supreme court does not appear to prevent it from being found to be procedurally defaulted here as untimely. However, in light of the ambiguity of the state supreme court order, and because the claim clearly fails on the merits, the Court finds the interests of judicial economy counsel in favor of addressing it on the merits. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.")

### ii)  merits

Petitioner's trial counsel filed a post-trial motion to strike the priors, arguing Petitioner had not committed any new violent or serious offenses in the twenty-three years following his prior convictions, that he had struggled with drug addiction throughout his entire adult life, had expressed remorse, and had shown an ability to be law abiding for lengthy periods of time and a willingness to rehabilitate himself. (ECF No. 25-33 at 117-20.) To the extent Petitioner contends counsel should have been more specific regarding the details of his priors, as discussed above in claim four, the record supports a finding the trial judge considered the specific aspects of his serious criminal history as outlined in the probation report prior to denying his motion to strike the priors.

Petitioner argues his counsel should have informed the trial judge he was once diagnosed with methamphetamine psychosis, had once pleaded not guilty by reason of insanity, and that his son died of cancer. Petitioner's trial counsel informed the court just

prior to sentencing that Petitioner wished to address the court, and he did so, stating that because his son died he could understand the grief of the victim's family. (ECF No. 25-31 at 5.) Petitioner was free at that time to inform the trial judge that his son's death was the result of cancer or discuss the effects of his methamphetamine use on his sanity but did not do so. In any case, the probation report states his son died of cancer, lists his history of methamphetamine use as he reported it to the probation officer, and indicates that although he took Prozac around the time of his son's death he "reported no history of psychological problems." (ECF No. 25-32 at 74.) He stated in his police interview he took Prozac for several months after his son died but had not "taken psych meds for 10 years." (*Id*. at 255.) Even to the extent he claims he needed the assistance of counsel to understand whether and to what extent those things were relevant at sentencing, they are in the probation report which the trial judge indicated he read, and in his police interview which the trial judge heard as it was played in open court for the jury.

Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" of his sentence arising from the failure of his counsel to highlight those issues. *See Strickland*, 466 U.S. at 694 (holding that prejudice requires showing "a probability sufficient to undermine confidence in the outcome.") Based on an independent review of the record, the denial of his claim by the state court was not objectively unreasonable. *See Pinholster*, 563 U.S. at 181 (holding that the standards of *Strickland* and 28 U.S.C. § 2254(d) are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt.") The Court finds the claim would fail even under de novo review. Habeas relief is denied as to claim eleven.

### N.     Claim 13

Petitioner alleges in claim thirteen that his Fourteenth Amendment right to due process was violated by the failure of the state habeas courts to hold an evidentiary hearing. (ECF No. 19 at 18.) Respondent answers that this claim is not cognizable on federal habeas because it alleges an error of state procedure and does not challenge the underlying judgment of conviction. (ECF No. 24-1 at 80.)

To present a cognizable federal habeas corpus claim under § 2254, a state prisoner must allege both that he is in custody pursuant to a "judgment of a State court," and that he is in custody in "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The allegation that the state habeas courts did not conduct an evidentiary hearing does not satisfy the second requirement for a cognizable habeas claim.  Habeas relief is denied as to claim thirteen because it does not present a cognizable claim.

## O.    Claim 14

Petitioner alleges in his final claim that his rights under the Fifth, Sixth and Fourteenth Amendments were violated because he is actually innocent.  (ECF No. 19 at 19-20.)  Respondent answers that this claim is procedurally defaulted because the state habeas courts barred it as untimely.  (ECF No. 24-1 at 81.)  Respondent alternately argues that a freestanding claim of actual innocence is not cognizable on federal habeas, and even if it is the claim is without merit.  (*Id*. at 81-84.)

Petitioner raised this claim in his second series of habeas petitions filed in the state superior (ECF No. 25-47), appellate (ECF No. 25-49), and supreme courts (ECF No. 25-51).  The superior court denied the petition without addressing the actual innocence claim.  (ECF No. 25-48, *In re McCreary*, No. NCN1519, order at 1-3.)  The appellate court addressed the claim and denied it as untimely and successive.  (ECF No. 25-50, *In re McCreary*, No. D074018, order at 2-3.)  The state supreme court denied the petition with an order stating: "The petition for writ of habeas corpus is denied.  (See *In re Clark* (1993) 5 Cal.4th 750, 767-769 (courts will not entertain habeas corpus claims that are successive).)"  (ECF No. 25-42, *In re McCreary*, No. S250337, order at 1.)

Because the state supreme court denied the claim as successive, and Respondent has provided no basis to support a finding that the state supreme court adopted the appellate court's finding of untimeliness, Respondent's contention the claim is procedurally defaulted on the basis the state supreme court found it untimely is rejected.  In any case, because Petitioner contends he can overcome any procedural default by establishing actual innocence, and because the claim clearly fails on the merits, the Court will address the

merits of the claim. *See Schlup*, 513 U.S. at 327-28 (holding that a procedurally defaulted claim can be reviewed on federal habeas where a petitioner establishes "it is more likely than not that no reasonable juror would have convicted him.")

It is an open question whether a freestanding claim of actual innocence as opposed to its use as a gateway to avoid a procedural default is cognizable on federal habeas. *See Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable."), citing *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013) (noting that it is, as yet, unresolved whether a freestanding actual innocence claim is cognizable on federal habeas) and *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (acknowledging the possibility that a freestanding actual innocence claim would exist in the capital context).

"The standard for establishing a freestanding claim of actual innocence is 'extraordinarily high.'" *Jones*, 763 F.3d at 1246, quoting *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). "We have held that, at a minimum, the petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id*. (internal quotation marks omitted). Petitioner "must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Majoy v. Roe*, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting *Schlup*, 513 U.S. at 327. This Court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). "A petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that 'a court cannot have confidence in the outcome of the trial.'" *Majoy*, 296 F.3d at 776, quoting *Carriger*, 132 F.3d at 478, quoting *Schlup*, 513 U.S. at 316.

/ / /

Petitioner claims he did not know the victim was going to be shot, that he had met Withers a few days earlier and did not know Withers had shot several other people including one in the same manner as the victim here, and relies primarily on his allegations of trial error identified in his federal Petition and discussed above. (ECF No. 19 at 19-20.) His new evidence includes photographs he contends show he is not tall enough to have been the shooter as described by Withers at trial, and the proffered testimony of four witnesses who did not testify at trial: (1) Roxanne Chavez who could testify Withers called her asking where Petitioner kept his gun in his car, (2) Ryan Paschini who could testify that Withers confessed to shooting the victim while Petitioner was driving and that he did it because he was jealous she had sex with one of his friends, and (3) Brian Baldino and Ricardo Michael Flores to whom Withers made "incriminating statements that placed the murder on himself and would have proved my innocence." (*Id.*) Petitioner presents a transcript of an interview with Ryan Paschini conducted by a District Attorney with Paschini's counsel present dated October 21, 2013, in which Paschini, seeking consideration in a pending criminal case against him, says Withers admitting killing the victim. (*Id.* at 112-61.) He contends Ricardo Michael Flores could testify that Withers told him while they were both in jail that he was not driving the car when the victim was shot, and that Baldino witnessed Withers kill someone and attempt to blame Baldino. (*Id.* at 172-73.)

As set forth above, strong evidence supported the jury's finding that Petitioner was the shooter, including his statement to Withers recorded by the police in which he admitted he was the shooter, disposed of the body and said he fixed a bullet hole in the car, the fact that he was in possession of the murder weapon when arrested and continued to drive the car in which the murder took place until shortly after Withers was arrested, Gallentine's testimony that Petitioner said he "blasted someone in the backseat," as well as evidence he and Withers planned the shooting and kidnapped the victim. In addition, evidence which was excluded at trial as a result of pre-trial motions (ECF No. 25-32 at 49, 57), and which is noted in the probation officer's report (*id.* at 66), showed Petitioner is associated with

the Aryan Nation prison gang, that both he and Withers are associated with the Nazi Lowriders prison gang, and that according to Petitioner's statement to the police the victim may have been killed as retribution for falsely accusing gang members of injecting her with bad drugs to make her pass out and taking turns raping her. (*Id*. at 67.) A statement attributed to Withers that "it was only supposed to be a rape," was excluded at trial, as was evidence that the hard drive on Petitioner's computer was found to contain 617 pornographic videos, 43 percent of which involved women being raped at gunpoint, while handcuffed, by masked men and with plastic bags over their heads, which the prosecutor unsuccessfully attempted to introduce to show Petitioner and Withers were going to rape the victim in retribution for her false accusation of rape "to show her what a rape is really like." (ECF No. 25-16 at 158-62.) On the other hand, Petitioner's new evidence consists primarily of proffered testimony of additional incarcerated inmates like Ming and Gallentine looking for cooperation agreements with the prosecution to provide evidence Withers incriminated himself cumulative to the testimony of Ming and Gallentine. Even if Petitioner's new evidence weakens the case against him, the evidence remains strong he was the shooter and he aided and abetted Withers in the kidnap and murder of the victim.

After a holistic look at all the evidence, the Court is unable to find that "it is more likely than not that no reasonable juror would have convicted (Petitioner) in the light of the new evidence." *Schlup*, 513 U.S. at 327. Petitioner has not carried his burden of showing a court cannot have confidence in the outcome of his trial based on his new evidence. *Majoy*, 296 F.3d at 776; *Carriger*, 132 F.3d at 478. The Court finds Petitioner has not excused the procedural default of any claim based on a showing of actual innocence, and to the extent a freestanding claim of actual innocence is cognizable, habeas relief is denied as to claim fourteen.

## P. Evidentiary Hearing

Petitioner requests an evidentiary hearing. (ECF No. 19 at 19.) An evidentiary hearing is not necessary where, as here, the federal claims can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis

for habeas relief.  *Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("It follows that if the record refutes the applicant's factual allegation or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.")  Petitioner's request for an evidentiary hearing is denied.

### Q.   Certificate of Appealability

The threshold for granting a Certificate of Appealability is "relatively low." *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002).  "[T]he only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 773 (2017).  The district court "shall indicate which specific issue or issues satisfy the standard for issuing a certificate, or state its reasons why a certificate should not be granted." *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

The Court finds, applying that standard, that a Certificate of Appealability is not warranted.  The claims and issues raised in this action are not sufficiently meritorious to deserve encouragement to proceed further, and Petitioner has not shown jurists of reason could disagree with the foregoing resolution.

## V.   CONCLUSION AND ORDER

For all the foregoing reasons, the Petition for a Writ of Habeas Corpus is **DENIED**. The Court **DENIES** a Certificate of Appealability.

Dated:  December 16, 2019

_____
Hon. Cathy Ann Bencivengo
United States District Judge